UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID ANDERSON, *on behalf of himself and all others similarly situated*, et al.,

                              Plaintiffs,

          v.

THE HUDSON NATIONAL GOLF CLUB, INC., *et al.*,

                              Defendants.

No. 23-CV-522 (KMK)

OPINION & ORDER

---

<u>Appearances</u>:

Clifford R. Tucker, Esq.
Sacco & Fillas, LLP
Astoria, NY
*Counsel for Plaintiffs*

Greg A. Riolo, Esq.
Adam S. Gross, Esq.
Alexander S. Dahle, Esq.
Jonathan M. Kozak, Esq.
Joseph J. DiPalma, Esq.
Jackson Lewis P.C.
New York, NY; White Plains, NY; Chicago, IL
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiffs David Anderson ("Anderson"), Michael Nigro ("Nigro"), Troy Moore

("Moore"), Joseph McGovern ("McGovern"), Ross Johnson ("Johnson"), Siya Duma ("Duma"),

and Conrad Brewer ("Brewer," and collectively, "Plaintiffs"), individually and on behalf of all

others similarly situated, bring this putative Collective and Class Action against Theron C.

Harvey ("Harvey"), Richard Hardin ("Hardin"), Kevin McConaughy ("McConaughy," and

collectively, the "Individual Defendants"), and the Hudson National Golf Club, Inc. ("Hudson

National" or the "Club," and together with the Individual Defendants, "Defendants"), pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq. ("FLSA"), and the New York Labor Law, § 190 et seq. ("NYLL").  (*See* Am. Compl. ("AC") ¶¶ 515–78 (Dkt. No. 27).)[1]  The thrust of Plaintiffs' Amended Complaint is that Defendants violated the FLSA and NYLL by, among other things, failing to remunerate Plaintiffs for their services at Hudson National as golf caddies.  (*See generally id.*)  Before the Court is Defendants' Motion To Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (*See* Not. of Mot. (Dkt. No. 39).)  For the reasons that follow, the Court grants in part and denies in part Defendants' Motion.

## I.  Background

### A.  Factual Background

Unless otherwise stated, the following facts are drawn from the Amended Complaint. The facts alleged therein are assumed true for the purpose of resolving the instant Motion.  *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).

#### 1.  The Parties

Hudson National is a private golf club, eighteen-hole course, and restaurant located in Croton-on-Hudson, New York.  (AC ¶¶ 2, 43.)  The Club has an annual gross volume of sales in excess of $500,000, earning approximately $10,022,741 in total revenue in 2020.  (*Id.* ¶¶ 44–45.) To join Hudson National, prospective members pay a membership fee of up to $100,000, as well as membership dues that can exceed $30,000 per year.  (*Id.* ¶¶ 46–47.)

With regard to the Individual Defendants, Harvey is the Director of Club Operations at Hudson National, and he had held that position since approximately 2014.  (*Id.* ¶¶ 55–56.)

---

[1] Unless otherwise noted (as here), the Court cites to the ECF-stamped page number in the upper-right corner of each page in cites from the record.

Hardin worked as a Caddie Master at Hudson National from approximately 2004 to approximately 2017.  (*Id.* ¶ 79.)[2]  Lastly, McConaughy was a Caddie Master at Hudson National from approximately 2017 to approximately June of 2021.  (*Id.* ¶ 90.)

Plaintiffs and other similarly situated individuals worked as golf caddies at Hudson National.  (*Id.* ¶¶ 2, 7.)  Anderson held that position from approximately 2005 to approximately June 23, 2021.  (*Id.* ¶ 8.)  Nigro worked at Hudson National as a golf caddie from approximately April 1, 2015 to August 2018.  (*Id.* ¶ 12.)  Moore did the same from approximately April 2012 to September 2017, (*id.* ¶ 16), as did McGovern from approximately October 1, 2013 to May 30, 2022, (*id.* ¶ 20).[3]  Johnson held his golf caddie position at Hudson National from approximately 2007 to November 2017, and from April 2019 to August 2019.  (*Id.* ¶ 24.)  Duma held that same position from approximately July 2019 to August 2022.  (*Id.* ¶ 35.)  Finally, Brewer was a golf caddie at Hudson National from approximately May of 2016 to July 4, 2017.  (*Id.* ¶ 39.)

### 2.  Caddies' Responsibilities at Hudson National

Hudson National requires golfers to use Hudson-National caddies, such as Plaintiffs here. (*See id.* ¶¶ 3, 338–39.)  Because Plaintiffs do not expressly state what it is that caddies do, the Court notes that the United States Golf Association's ("USGA") Rules of Golf define "caddie" as "[s]omeone who helps a player during a round [of golf], including" by "[c]arrying, [t]ransporting, or [h]andling [a player's] clubs" or by giving a player golfing advice.  USGA, Rules of Golf § XI (Definitions), https://www.usga.org/rules/rules-and-clarifications/rules-and-

---

[2] As alleged, Caddie Masters at Hudson National had the power to hire caddies, and also to issue written and/or verbal reprimands to caddies.  (*See* AC ¶¶ 106–07, 111.)  Further, Caddie Masters at Hudson National are alleged to have issued written and/or verbal threats to fire caddies for actual or perceived infractions.  (*Id.* ¶ 112.)

[3] In the Amended Complaint, Plaintiffs separately indicate that McGovern worked as a golf caddie at Hudson National from approximately 2012 to May 2022.  (AC ¶ 31.)

clarifications.html#!ruletype=fr&section=definitions; *see also id.* Rule 10.3 (providing in detail what a caddie may, and may not, do to assist a player during a round of golf).[4]  The Club assigned caddies to work with specific golfers.  (*Id.* ¶ 261.)  Caddies were not free to reject work with assigned golfers.  (*Id.* ¶ 262.)  Thus, if a caddie refused to work with an assigned golfer, they would be punished in one or more ways, such as by getting removed from the work schedule or getting assigned to lower paying or otherwise "undesirable" golfers and groups.  (*Id.* ¶ 264.)

In addition to their traditional responsibilities, Hudson National's caddies were at times required to perform other tasks too, such as greeting members and guests at the Club; maintaining, moving, and cleaning golf carts; monitoring golfers' pace of play; bring golfers beverages and/or other items; monitoring the driving ranges for cleanliness; repairing divots, fixing ball marks, and raking bunkers; and cleaning the caddie shack and other parts of the Club.  (*See id.* ¶¶ 29, 121, 192–94, 274.)

Beyond the foregoing, Hudson National caddies were required to wear uniforms and were subject to a number of internal policies.  (*See id.* ¶¶ 61–64.)  For example, they were required to refer to members and guests as "Mr." and "Mrs.," and to report slow play and any instances of poor golfing etiquette.  (*Id.* ¶¶ 62, 64.)  Further, they were required to attend

---

[4] The Court has no trouble in concluding that it may judicially notice the USGA's Rules of Golf.  *See* Fed. R. Evid. 201 (explaining that a court "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Dahl v. Mandrusiak*, No. 18-CV-2225, 2020 WL 8483833, at *5 (D. Nev. May 28, 2020) (citing to the Rules of Golf); *Windage, LLC v. U.S. Golf Ass'n*, No. 07-CV-4897, 2008 WL 2622965, at *1 (D. Minn. July 2, 2008) (explaining that the USGA "has functioned as the exclusive governing body of golf for the United States, its territories, and Mexico" since 1894, and that it promulgates the Rules of Golf with the Royal & Ancient Golf Club in St. Andrews, Scotland, which itself "functions as the governing body of golf for the rest of the world").

periodic meetings on-site at the Club, as well as a thirty-minute "rally" meeting before each golf outing. (*See id.* ¶¶ 189–90, 195–96.) One Plaintiff—Anderson—alleges that he was required to catch stray cats at Hudson National's clubhouse. (*Id.* ¶ 376.)

In general, caddies were told to be at Hudson National whenever possible during the golf season, in case a golfer in need of a caddie arrived. (*See id.* ¶ 197; *see also id.* ¶ 198 ("Caddies were frequently told 'you can't make money at home,' which meant that caddies were required or permitted or encouraged to go to Hudson National . . . just in case a golfer showed up for a round.").) Indeed, Plaintiffs allege that caddies at Hudson National "were led to believe that if they left the site and a golfer arrived but there were no caddies available, the caddie(s) who left would not work again, i.e., be punished." (*Id.* ¶ 201.)

### 3. Bag Fees

With limited exceptions, Hudson National did not pay caddies for their work, regardless of the numbers of hours they worked in a given week. (*See id.* ¶¶ 4, 158.)[5] Instead, caddies like Plaintiffs received payment from golfers directly in the form of so-called "Bag Fees." (*See id.* ¶¶ 159–68.)

More specifically, Hudson National instructed members and their guests that they "may compensate a caddie based upon the caddie's level of performance and the [m]ember's degree of satisfaction[,]" and the Club provided an "all-inclusive suggested [c]addie [r]ate [of] $125 [p]er [b]ag for [eighteen h]oles and $65 [p]er [b]ag for [nine h]oles." (*Id.* ¶¶ 160–61 (citations

---

[5] Hudson National did pay caddies directly to the extent they worked on golf outings—which included marketing groups and "golf digest raters"—and special events. (AC ¶¶ 180, 219, 305.) Specifically, Hudson National would pay caddies the $125 per bag in those situations. (*Id.* ¶ 219.) However, caddies were required to tell the Caddie Master how much the golfers tipped them, and the Club would then reduce the amount it paid to the caddie by using the gratuities as an offset. (*Id.*)

omitted); *see also id.* ¶ 162 ("Hudson National . . . stated [in its guest rules], 'the caddie fee for

golf professional staff is customarily paid by the member, members, or guests in their group.'"

(citation omitted)).)  Thus, notwithstanding the suggested Bag Fee amounts, golfers had the

discretion to pay less than that amount and did so at times.  (*Id.* ¶ 165; *see also id.* ¶ 167 ("The

amount the golfer chooses to pay in a bag payment is contingent on the golfer's discretion and

satisfaction with the caddie.  The golfer could pay more than the suggested bag rate or less.").)[6]

To the extent that a golfer paid less than the suggested Bag Fee, caddies were told that it would

be "made up next time" or that a Caddie Master "may take steps to obtain additional payment

from the golfer to give to the caddie."  (*Id.* ¶ 166.)

     Bag Fees were paid directly from the golfers to the caddies, sometimes in the form of

direct cash payments.  (*Id.* ¶¶ 168–69.)  Other times, golfers would pay their Bag Fee through

Hudson National's "chit" system, where the Club would withdraw funds from the golfer's

account in order to pay the caddie.  (*Id.* ¶ 171.)  Although Hudson National incidentally

maintained copies of Bag Fee payments made through its chit system, it did not, in general, track

the Bag Fees that were earned by each caddie.  (*Id.* ¶¶ 136, 173, 312.)  Additionally, Hudson

National did not take a tax deduction from the Bag Fees its caddies received, such that the full

amount of the Fee that a golfer paid was typically paid to the caddie without deductions or

allowances for payroll taxes.  (*Id.* ¶¶ 174–75.)[7]

---

[6] Although golfers could pay caddies more than the suggested Bag Fees pursuant to
Hudson National's policy, Plaintiffs allege that a Caddie Master would frequently require
caddies to report the amount of money golfers paid them, and then direct the caddie to return
excess money to the golfer if the Caddie Master determined the caddie had been "overpaid."
(AC ¶¶ 218, 310.)

[7] Plaintiffs also allege that Hudson National did not treat Bag Fees as revenue, profits, or
costs, nor did it deduct those Fees as payroll expenses.  (AC ¶¶ 176–78.)

As a consequence of this payment scheme, caddies were not guaranteed payment just for showing up to work.  (*See id.* ¶ 179.)  For instance, if golfers canceled their round, the caddie would lose out on Bag Fees.  (*Id.* ¶¶ 179, 199.)

In terms of tipping, the Club has a policy against its employees—except its caddies—accepting gratuities; however, caddies were at times required to return gratuities they received from golfers.  (*Id.* ¶¶ 163–64.)

### 4.  Plaintiffs' Work Schedules and Earnings

At Hudson National, caddies generally work from approximately April 10 to approximately November 20 each year.  (*See id.* ¶ 355.)

Each April, Anderson worked approximately 61.5 hours each week and earned around $285 per day in Bag Fees.  (*See id.* ¶¶ 357–58.)  In May, Anderson worked approximately 70.75 hours per week, earning $350 per day in Bag Fees.  (*See id.* ¶¶ 359–60.)  In June, he worked approximately 71.5 hours each week and earned around $480 each day in Bag Fees.  (*See id.* ¶¶ 361–62.)  In July, he worked around 73 hours each week and earned around $460 per day in Bag Fees.  (*See id.* ¶¶ 363–64.)  In August, Anderson worked around 70.5 hours each week and earned approximately $395 per day in Bag Fees.  (*See id.* ¶¶ 365–66.)  In September, he worked around 66 hours per week and earned approximately $475 per day in Bag Fees.  (*See id.* ¶¶ 367–68.)  In October, he worked approximately 59.5 hours per week and earned around $455 per day in Bag Fees.  (*See id.* ¶¶ 369–70.)  In November, Anderson worked approximately 45 hours each week and earned around $255 per day in Bag Fees.  (*See id.* ¶¶ 371–72.)

With respect to Nigro, he worked approximately 40 hours per week each April, earning around $200 per day in Bag Fees.  (*See id.* ¶¶ 382–83.)  In May and June, he worked around 36 hours each week, earning approximately $275 and $300 per day in Bag Fees in May and June,

respectively. (*See id.* ¶¶ 384–85, 387.) In July, August, and September, Nigro worked around

41 hours each week, and earned approximately $300 per day in Bag Fees in July and August, and

around $250 per day in Bag Fees in September. (*See id.* ¶¶ 386–88.) In October, he worked

around 36 hours per week and earned around $190 per day in Bag Fees. (*See id.* ¶¶ 389–90.)

And in November, Nigro worked around 51 hours each week and earned approximately $135 per

day in Bag Fees. (*See id.* ¶¶ 391–92.)

As to Moore, he worked approximately 59 hours per week each April, earning around

$125 in Bag Fees each day. (*See id.* ¶¶ 398–99.) In May, Moore worked approximately 75

hours per week and earned around $200 per day in Bag Fees. (*See id.* ¶¶ 400–01.) In June, July,

August, and September, he worked around 67.5 hours per week, earning approximately $375 in

Bag Fees in June, July, and August, and around $275 per day in Bag Fees in September (*See id.*

¶¶ 402–05.) Finally, in October, Moore worked approximately 61.5 hours per week and earned

around $175 per day in Bag Fees. (*See id.* ¶¶ 406–07.)

Each April, McGovern worked approximately 58 hours per week and earned around $300

per day in Bag Fees. (*See id.* ¶¶ 411–12.) In May, he worked around 63 hours per week, earning

around $250 per day in Bag Fees. (*See id.* ¶¶ 413–14.) In June, July, August, and September,

McGovern worked around 72 hours per week and earned approximately $275 per day in Bag

Fees. (*See id.* ¶¶ 415–16.) In October, he worked around 60 hours per week and earned

approximately $225 per day in Bag Fees. (*See id.* ¶¶ 417–18.) And in November, McGovern

worked around 51 hours per week, earning around $200 per day in Bag Fees. (*See id.* ¶¶ 419–

20.)

As for Johnson, he worked around 61 hours per week in April, earning around $230 per

day in Bag Fees. (*See id.* ¶¶ 425–26.) In May, June, July, and August, Johnson worked around

76 hours per week and earned around $300 per day in Bag Fees in May and June, and around $450 per day in Bag Fees in July and August (*See id.* ¶¶ 428–30.)  In September, he worked around 74 hours per week, earning approximately $440 per day in Bag Fees. (*See id.* ¶¶ 432–33.)  Finally, in October and November, Johnson worked approximately 61 hours per week, earning around $330 per day in Bag Fees in October, and $175 per day in Bag Fees in November.  (*See id.* ¶¶ 435–36, 438.)

With regard to Duma, he worked around 47 hours per week in April and earned around $200 per day in Bag Fees. (*See id.* ¶¶ 455–56.)  In May, Duma worked approximately 62 hours per week, earning around $200 per day in Bag Fees.  (*See id.* ¶¶ 457–58.)  In June, he worked around 71 hours per week and earned around $250 per day in Bag Fees.  (*See id.* ¶¶ 459–60.)  In both July and August, Duma worked approximately 77 hours per week, earning around $425 per day in Bag Fees in July, and around $290 per day in Bag Fees in August.  (*See id.* ¶¶ 461–64.)  In September, Duma worked around 70 hours per week and earned around $200 per day in Bag Fees.  (*See id.* ¶¶ 465–66.)  Finally, in October and November, Duma worked approximately 52 hours per week, earning around $175 per day in Bag Fees during each of those months.  (*See id.* ¶¶ 467–70.)

Each April, Brewer worked approximately 63 hours per week, earning around $275 per day in Bag Fees.  (*See id.* ¶¶ 474–75.)  In May, he worked around 62 hours each week and earned around $275 per day in Bag Fees.  (*See id.* ¶¶ 476–77.)  In June, he worked approximately 64 hours per week and earned around $300 per day in Bag Fees.  (*See id.* ¶¶ 478–79.)  In July, Brewer worked around 58 hours each week and earned around $350 per day in Bag Fees.  (*See id.* ¶¶ 480–81.)  In August, he worked around 73 hours per week, earning around $350 per day in Bag Fees.  (*See id.* ¶¶ 482–83.)  In September, Brewer worked around 58 hours

per week and earned approximately $350 per day in Bag Fees.  (*See id.* ¶¶ 484–85.)  In October,

he worked approximately 61 hours each week and earned around $350 per day in Bag Fees.  (*See*

*id.* ¶¶ 486–87.)  Finally, in November, Brewer worked approximately 51 hours each week,

earning around $275 per day in Bag Fees.  (*See id.* ¶¶ 488–89.)

    B.  Procedural History

      Plaintiffs initiated this Action on January 20, 2023.  (*See* Compl. (Dkt. No. 1).)  On April

6, 2023, Defendants filed a pre-motion letter, seeking leave to move to dismiss Plaintiffs' initial

Complaint.  (*See* Letter from Joseph J. DiPalma, Esq. to Court (Apr. 6, 2023) (Dkt. No. 21).)

Plaintiffs filed a response on April 12, 2023, indicating that they intended to amend the

Complaint.  (*See* Letter from Clifford Tucker, Esq. to Court (Apr. 12, 2023) (Dkt. No. 22).)

      After requesting and receiving an extension to the applicable deadline, (*see* Dkt. Nos. 25–

26), Plaintiffs filed the Amended Complaint on May 30, 2023, (*see* AC).  On July 14, 2023,

Defendants filed a letter seeking leave to file the instant Motion.  (*See* Letter from Adam S.

Gross, Esq. to Court (July 14, 2023) (Dkt. No. 33).)  Plaintiffs filed a response on July 21, 2023.

(*See* Letter from Clifford Tucker, Esq. to Court (July 21, 2023) (Dkt. No. 34).)  On July 31,

2023, the Court held a pre-motion conference at which it adopted a briefing schedule.  (*See* Dkt.

(minute entry for July 31, 2023); Scheduling Order (Dkt. No. 37).)

      Pursuant to that briefing schedule, Defendants filed their Motion on September 21, 2023.

(*See* Not. of Mot.; Mem. of Law in Supp. of Mot. ("Defs' Mem.") (Dkt. No. 40); Aff. of Adam

Gross, Esq. in Supp. of Mot. ("Gross Aff.") (Dkt. No. 41).)  On November 10, 2023, Plaintiffs

filed their Opposition.  (*See* Pls' Mem. of Law in Opp'n to Mot. ("Pls' Opp'n") (Dkt. No. 42).)

After requesting and receiving an extension of time to file, Defendants submitted their Reply on

December 12, 2023.  (*See* Defs' Reply Mem. of Law in Supp. of Mot. ("Defs' Reply") (Dkt. No.

45).)

On June 20, 2024, in light of Judge Seibel's January 9, 2024 oral ruling in *Hopkins v. Wykagyl Country Club*, No. 22-CV-10399 (S.D.N.Y.), the Court ordered the Parties to submit supplemental briefing. (*See* Order (Dkt. No. 47).) Defendants and Plaintiffs filed their supplemental briefs on July 22, 2024. (*See* Defs' Supp. Mem. (Dkt. No. 48); Pls' Supp. Mem. (Dkt. No. 49).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*. (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id*.; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-

11

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

> B.  Analysis

In the Amended Complaint, Plaintiffs assert ten causes of action—two arising under the FLSA and eight arising under the NYLL.  (AC ¶¶ 515–78.)  With respect to the FLSA claims, Plaintiffs allege that Defendants failed to pay them and those similarly situated the minimum wages to which they were entitled.  (*Id.* ¶ 515–22.)  Plaintiffs also allege that Defendants failed to pay them and those similarly situated the overtime pay to which they are entitled under the FLSA for all hours worked beyond 40 per workweek.  (*Id.* ¶ 523–28.)  As to the NYLL claims, Plaintiffs allege that Defendants failed: to pay minimum hourly wages, (*id.* ¶¶ 529–34); to pay

overtime wages, (*id.* ¶¶ 535–38); to provide wage notices, (*id.* ¶¶ 539–45); to provide accurate wage statements, (*id.* ¶¶ 546–52); to provide spread-of-hours compensation, (*id.* ¶¶ 553–59); to launder and/or maintain mandatory uniforms, or to provide reimbursement for mandatory uniform-related expenses, (*id.* ¶¶ 560–64); to pay "call-in pay" wages, (*id.* ¶¶ 565–72); and to pay Plaintiffs on a weekly basis given their status as "manual workers," (*id.* ¶¶ 573–78).

In support of their Motion, Defendants assert that Plaintiffs have failed to state a claim for unpaid minimum wages because they did not allege any week worked where they in fact earned less than minimum wage when accounting for Bag Fees. (*See* Defs' Mem. 14–16.) Relatedly, Defendants further argue that Bag Fees paid to the caddies amounted to remuneration for their services and thus satisfied Defendants' minimum wage obligations. (*See id.* at 17–20.) With respect to Plaintiffs' claim for unpaid overtime wages, Defendants contend that Plaintiffs have failed to provide sufficient allegations regarding any specific workweeks during which they worked overtime, nor the specific number of overtime hours they actually worked. (*See id.* at 20–21.) Finally, Defendants argue that, insofar as Plaintiffs' federal FLSA claims are dismissed, the Court should decline to exercise supplemental jurisdiction over their remaining claims. (*See id.* at 22.)

The Court will address Defendants' arguments to the extent necessary to resolve the instant Motions.

### 1. Plausibility of Alleged Wage Claims

"To state an FLSA wage claim, a plaintiff must allege that: (1) he was the defendant's employee; (2) his work involved interstate activity; and (3) he worked for hours for which he did not receive minimum and/or overtime wages." *Hermida v. 101 Moronta Food Corp.*, No. 23-CV-4352, 2024 WL 3089962, at *2 (S.D.N.Y. June 20, 2024) (citing *Tackie v. Keff Enter., Inc.*,

No. 14-CV-2074, 2014 WL 4626229, at *2 (S.D.N.Y. Sept. 16, 2014)); *see also Ramirez v. Sake II Japanese Rest., Inc.*, No. 20-CV-9907, 2023 WL 3354881, at *5 (S.D.N.Y. Apr. 24, 2023) (same), *report and recommendation adopted*, 2023 WL 3346768 (S.D.N.Y. May 10, 2023); *Pineda v. Tokana Cafe Bar Restorant Inc.*, No. 16-CV-1155, 2017 WL 1194242, at *2 (S.D.N.Y. Mar. 30, 2017) (same).

"The requirements to make out a claim under the NYLL mirror the FLSA in most respects, except that the NYLL does not require a plaintiff to show that the employer was involved in interstate commerce or had $500,000 in minimum annual sales, as required for the interstate commerce element of an FLSA claim." *Soto v. Crismeli Deli Grocery Inc.*, No. 19-CV-10053, 2024 WL 3730115, at *5 (S.D.N.Y. June 28, 2024) (quotation marks and citation omitted), *report and recommendation adopted*, 2024 WL 3730300 (S.D.N.Y. Aug. 8, 2024). Accordingly, the Court will consider Plaintiffs' overlapping FLSA and NYLL minimum wage and overtime claims together. *See Marcus v. Lominy*, No. 18-CV-1857, 2022 WL 493688, at *13 (S.D.N.Y. Feb. 17, 2022) ("[B]ecause the NYLL is the state analogue to the federal FLSA and it mirrors the FLSA in compensation provisions regarding minimum hourly wages and overtime , the [c]ourt's ensuing analysis . . . will solely focus on federal law but applies equally to [the plaintiff's] claims under the FLSA and the NYLL.").

For purposes of the instant Motion, Defendants do not dispute that Plaintiffs were their employees. (Defs' Mem. 6 n.2.) Nor do they appear to dispute that Plaintiffs' work implicated interstate commerce. (*See generally id.*; *see also* AC ¶¶ 48–49 (alleging that Hudson National was "engaged in interstate commerce").) Thus, the remainder of this section will focus on whether Plaintiffs plausibly alleged that they "worked for hours for which [they] did not receive minimum and/or overtime wages." *Hermida*, 2024 WL 3089962, at *2.

a.  Minimum Wage Claims

The Court turns first to Plaintiffs' minimum wage claims.  To state a plausible minimum wage claim, "it is sufficient for a plaintiff to allege facts about [his or] her salary and working hours, such that a simple arithmetical calculation can be used to determine the amount owed per pay period."  *Su v. Advanced Care Staffing, LLC*, — F. Supp. 3d —, 2024 WL 2053706, at *8 (E.D.N.Y. May 8, 2024) (quoting *Lopez-Serrano v. Rockmore*, 132 F. Supp. 3d 390, 402 (E.D.N.Y. 2015)); *see also Hermida*, 2024 WL 3089962, at *2 (same); *Rodriguez v. Franco Realty Assocs., LLC*, No. 22-CV-6380, 2023 WL 8762994, at *3 (S.D.N.Y. Dec. 19, 2023).

Here, the applicable federal and state minimum wages are somewhat beside the point at this juncture.  That is so because Plaintiffs allege that Hudson National paid them *nothing* for their work, except in the limited circumstances where they worked outings.  (AC ¶¶ 179–80, 182.)  Defendants counter, arguing that the Bag Fees Plaintiffs received from members and their guests more than covered the applicable minimum wage requirements.  (Defs' Mem. 14–19.)  In response, Plaintiffs assert that the Bag Fees were tips and, therefore, did not count at all toward Defendants' statutory wage obligations.  (Pls' Opp'n 12–20.)  Thus, the primary question before the Court is whether Plaintiffs plausibly alleged that their Bag Fees are tips, rather than something akin to wages, such as service charges.  (*See id.*; Defs' Mem. 17–19.)[8]  For the reasons that follow, the Court concludes that Plaintiffs have met their pleading burden.

Another court in this District was recently faced with the same issue arising out of a similar set of facts.  Specifically, in *Hopkins v. Wykagyl Country Club*, Judge Siebel denied the

---

[8] A service charge is "[a] compulsory charge for service[] . . . imposed on a customer by an employer's establishment."  *See* 29 C.F.R. § 531.55(a).  Such charges are not tips and, "[w]here such sums are distributed by the employer to its employees[] . . . they may be used in their entirety to satisfy the monetary requirements of the [FLSA.]"  *Id.* §§ 531.55(a)–(b).

defendant-golf club's motion to dismiss a minimum wage claim, concluding that the plaintiff-caddies plausibly alleged that the defendant failed to pay them minimum wages under the FLSA and NYLL, notwithstanding the fact that they received bag fees from golfers.  (*See* Oral Ruling ("*Hopkins* Ruling") 9:25–15:22 (Dkt. No. 34, 22-CV-10399 Dkt.).)  Because the Court agrees with Judge Siebel's well-reasoned analysis in *Hopkins*, a brief overview of that case is in order.

Like Plaintiffs here, the plaintiffs in *Hopkins* had worked at the defendant-golf club as caddies, and alleged that—although they received both bag fees and tips from golfers—the club did not pay them any wages whatsoever.  (*See id.* at 6:22–7:22.)  Notably, it appears to have been undisputed in that case that golfers were *required* to pay bag fees at the defendant-golf club. (*See id.* at 5:25–6:3, 11:25–12:3; *see also* First Amended Compl. ¶ 61 ("Golfers pay the Golf Caddies a $120 fee per each golf bag they carry.") (Dkt. No. 13, 22-CV-10399 Dkt.).)  And, there—as here—the defendant asserted that "the bag fees were mandatory service charges that [could] be applied against the [statutory] minimum wage requirements . . . , not [] tip[s] that [could not.]"  (*Hopkins* Ruling 11:17–20.)

Judge Siebel began her analysis by considering the applicable regulations promulgated by the Department of Labor ("DOL").  (*See id.* at 11:25–13:11.)  Although the bag fees at issue in that case were mandatory and therefore fell within the plain meaning of the definition of "service charges" under DOL's regulations—namely, 29 C.F.R. § 531.55—Judge Siebel was "not convinced" that regulation should "drive [her] decision" because it "describes what counts as a tip for purposes of the tip credit."  (*Id.* at 12:3–24.)  Instead, Judge Siebel concluded that the "better way to approach the issue" was to apply a multi-factor test identified in, among other cases, *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 931–34 (S.D.N.Y. 2013), to determine whether a customer payment was a tip or a service charge.  (*Id.* at 13:16– 14:3 (noting

that the factors courts consider under that test include, inter alia, whether customers give up their money voluntarily, "whether the amount was up to the customer, the method of distribution, the customer's understanding, inclusion in the employer's gross receipts, whether the payment was made directly to the employee, whether it was regarded as the employee's property, whether the employer tracked it, and whether it was for a personal service").)  Ultimately, because there were "factors favoring both sides" and the case was only at the motion-to-dismiss stage, Judge Siebel ruled that the plaintiffs stated a plausible minimum wage claim.  (*See id.* at 13:25–14:3, 15:7–8, 15:20–22.)

Like Judge Siebel, and given that "the FLSA does not explicitly define 'tips' or 'service charges[,]'" this Court begins with DOL's regulations.  *Benavidez v. Greenwich Hotel Ltd. P'ship ("Benavidez II")*, No. 16-CV-191, 2019 WL 1230357, at *8 (D. Conn. Mar. 15, 2019) (explaining that DOL's regulations have "filled in this statutory gap").  With respect to tips, 29 C.F.R. § 531.52 provides that "[a] tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for the customer[,]" which "is to be distinguished from payment of a charge[] . . . made for the service."  29 C.F.R. § 531.52(a) ("Whether a tip is to be given, and its amount, are matters determined solely by the customer.")  "In addition to cash sums presented by customers which an employee keeps as his [or her] own, tips received by an employee include[:] . . . amounts paid by bank check or other negotiable instrument payable at par and amounts transferred by the employer to the employee pursuant to directions from credit customers who designate amounts to be added to their bills as tips."  *Id.* § 531.53.  By contrast, and as noted above, service charges include "compulsory charge[s] for service[] . . . imposed on a customer by an employer's establishment[.]"  *Id.* § 531.55(a).

Based solely on the foregoing regulations, and accepting the allegations in the Amended Complaint as true, the Court concludes that Plaintiffs have plausibly alleged that their Bag Fees were tips, not service charges.  In particular, Plaintiffs plausibly allege that Hudson National's members and guests paid them for their caddie services based on their satisfaction with Plaintiffs' performance, and that they either paid Plaintiffs directly in cash or through the chit system with the Club as a mere intermediary.  (*See* AC ¶¶ 167–172.)  *See also* 29 C.F.R. §§ 531.52–53.  And, far from being "compulsory," 29 C.F.R. §§ 531.55(a), Plaintiffs aver that the Bag Fees at Hudson National were *discretionary*, not mandatory, (*see* AC ¶¶ 161–62 (alleging that the Bag Fees were "*suggested*" and that such Fees were "*customarily* paid by the member[s] . . . or guests in their group" (emphases added)); *id.* ¶ 165 (reiterating that the bag fees were "*suggested*" and explaining that "golfers had the *discretion* to pay less than [the suggested] amount and, at times, did so" (emphases added)); *id.* ¶ 167 (also stating that the amount paid in Bag Fees "is contingent on the golfer's *discretion* and satisfaction with the caddie" (emphasis added)).)  Although Plaintiffs allege that "[i]f a golfer paid less than the suggested [Bag Fee], then the caddie was at times told that it would be 'made up next time,'" they do not allege how often they were told that or, indeed, whether any golfer ever made them whole during their next round.  (*Id.* ¶ 166; *see also id.* (noting that a Caddie Master "*may* take steps to obtain additional payment from the golfer" when they paid less than the suggested Bag Fee (emphasis added).)[9]

---

[9] The Court therefore disagrees with Defendants' meritless assertion that certain allegations in the Amended Complaint suggest that the Bag Fees Plaintiffs received were, in fact, mandatory.  (*See, e.g.*, Defs' Mem. 17 (citing AC ¶¶ 161–62, 165–68, 231); *see also id.* at 8 n.3; Defs' Supp. Mem. 7 n.3.)

However, in accord with the *Hopkins* Ruling, the Court does not end its analysis there. When determining whether "a fee [] constitute[s] a service charge rather than a tip, and therefore [can] be properly applied against an employer's statutory minimum-wage obligations" courts have separately considered a variety of factors, such as "(a) whether the payment was made by a customer who has received a personal service; (b) whether the payment was made voluntarily in an amount and to a person designated by the customer; (c) whether the tip is regarded as the employee's property; (d) the method of distributing the payment; and (e) the customer's understanding of the payment[.]" *Benavidez v. Greenwich Hotel Ltd. P'ship ("Benavidez I")*, No. 16-CV-191, 2017 WL 1051184, at *3 (D. Conn. Mar. 20, 2017) (quoting *Hart*, 967 F. Supp. 2d at 932); *see also Hart*, 967 F. Supp. 2d at 932–33 (making clear that the first three factors, if found to be in the affirmative, auger in favor of determining that a given fee is a tip); *Chan v. Triple 8 Palace, Inc.*, No. 03-CV-6048, 2006 WL 851749, at *7 (S.D.N.Y. Mar. 30, 2006) (explaining that the following factors, among others, militate in favor of finding that a payment is a tip, rather than a service charge: whether the tip is paid directly to the recipient; whether the recipient "kept the entire amount if paid in cash"; and whether the defendants kept records of the payments at issue), *superseded by regulation on other grounds as stated in Hernandez v. Jrpac Inc.*, No. 14-CV-4176, 2016 WL 3248493, at *23 (S.D.N.Y. June 9, 2016). (*Accord Hopkins* Ruling 13:16–24.)[10]

---

[10] To be sure, the court in *Hart* conducted its multi-factor in the alternative. 967 F. Supp. 2d at 931–33. Its principal holding was that "for a fee to constitute a service charge and therefore be properly applied against an establishment's statutory minimum-wage duty, it must have been included in the establishment's gross receipts." *Id.* at 929. In connection with that holding, the *Hart* court relied on 29 C.F.R. § 531.55(b), which, as noted, "describes what counts as a tip for purposes of the tip credit." (*Hopkins* Ruling 12:23–24.) *See also Hart*, 967 F. Supp. 2d at 929. That rationale, however, has limited force in the golf-caddie context because, more than fifty years ago, the Internal Revenue Service determined that golf clubs like Hudson National are "not liable for [Federal Insurance Contributions Act] and [Federal Unemployment

Again, accepting Plaintiffs' allegations at true, as the Court must at the motion-to-dismiss stage, the Amended Complaint plausibly avers that the Bag Fees Plaintiffs received were tips, rather than service charges.  Tracking the factors as set forth in *Hart*, Plaintiffs have alleged that: (1) Hudson National's members and guests paid the Bag Fee to caddies like Plaintiffs based on the services they provided to them, (*see* AC ¶¶ 160, 167); (2) although the "suggested" Bag Fee was $125, golfers had the discretion to pay whatever amount they wanted to their caddies, (*see id.* ¶¶ 165, 167); (3) "[t]he full amount of the bag payment that the golfer paid was typically paid to the caddie," (*id.* ¶ 175); and (4) golfers paid the caddies their Bag Fees either directly in cash or through Hudson National's chit system, under which the Club only served as a conduit to pay the caddies, (*see id.* ¶¶ 168–69, 171–72).  *See Hart*, 967 F. Supp. 2d at 932.  In also bears noting that, as alleged, Defendants did not track or otherwise document the Bag Fees its caddies received, beyond retaining receipts of payments made through the chit system as part of that system.  (*See* AC ¶¶ 136, 173, 312.)  *See also Chan*, 2006 WL 851749, at \*7; *cf. Hart*, 967 F. Supp. 2d at 932 (determining that "[t]he accident that a subset of the performance fees happened to have been paid by credit card and took the form of vouchers, and therefore that these fees temporarily passed from the [plaintiff-]dancer to [the defendant's] before being converted to cash, does not alter their essential character").  On balance, then, the aforementioned factors weight conclusively in favor of determining that, as alleged, the Bag Fees were tips for purposes of Plaintiffs' minimum wage claims.  *See, e.g.*, *Hart*, 967 F. Supp. 2d at 932–33 (concluding that the performance fees at issue were tips pursuant to this analysis where they: "included direct cash payments by customers to the dancers, which were of varying size and were completely

---

Tax Act] taxes with respect to remuneration paid to caddies either directly by club members or indirectly by the club acting as the agent of the members[.]"  Rev. Rul. 69-26, 1969-1 C.B. 251. Thus, this Court will instead rely on the more fulsome, multi-factorial analysis.

unrecorded"; "were understood by [the defendant] to be the property of the dancer"; and "were paid directly by the customer to the dancer").

For the first time on Reply, Defendants argue that the Bag Fees were the wages for Hudson National's caddies because the Parties' course of dealing demonstrates that there was an implicit agreement that such fees would constitute the caddies' remuneration.  (Defs' Reply 6–9.)  In connection with this argument, Defendants rely in part on the Third Circuit's decision in *Secretary United States Department of Labor. v. Bristol Excavating, Inc.*, in which that court held, "a third-party payment qualifies as remuneration for employment only when the employer and employee have effectively agreed it will."  935 F.3d 122, 135 (3d Cir. 2019) (analyzing whether certain third-party bonuses qualified as remuneration when those bonuses were paid by a "large natural gas production company" to the employees of the defendant, "a small excavation [company]").  The Third Circuit went on to explain that the question of "[w]hether an *implicit* agreement has developed between an employer and its employees that third-party bonuses are rightly regarded as 'remuneration for employment' is a question that does not lend itself to an easy, bright-line test."  *Id.* at 135 (emphasis added).  Instead, "in order for a course of dealing to result in an implied agreement to treat third-party [payments] as remuneration for employment, a fact finder should consider whether the specific requirements for receiving the payment are known by the employees in advance of their performing the relevant work; whether the payment itself is for a reasonably specific amount; and whether the employer's facilitation of the payment is significantly more than serving as a pass through vehicle."  *Id.* at 137; *see also* U.S. DOL, Wage & Hour Div., Opinion Letter (June 25, 2020) (citing the test set forth in *Bristol Excavating* favorably, in the context of responding to an inquiry as to whether "an automobile manufacturer's direct payments to an automobile dealership's employee, compensating the

21

employee for work done on behalf of the dealership, may count toward the dealership's minimum wage obligation to the employee").[11]

Defendants' argument in this regard does not change the Court's analysis here. To start, arguments such as this that are "not made until a reply brief are [generally deemed] waived." *Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 476 n.12 (S.D.N.Y. 2020) (quoting *Doe v. City of New York*, No. 15-CV-117, 2018 WL 6095847, at *8 (S.D.N.Y. Nov. 21, 2018)); *see also Amara v. Cigna Corp.*, No. 01-CV-2361, 2024 WL 1985904, at *5 (D. Conn. May 6, 2024) ("[A]rguments raised for the first time in a reply brief are generally deemed waived." (citing *Tardif v. City of New York*, 991 F.3d 394, 404 n.7 (2d Cir. 2021)); *Tenemille v. Town of Ramapo*, No. 18-CV-724, 2022 WL 2047819, at *6 (S.D.N.Y. June 7, 2022) ("Arguments made for the first time in a reply brief need not be considered by a court, of course." (alteration adopted) (quotation marks omitted) (quoting *Kowalski v. YellowPages.com, LLC*, No. 10-CV-7318, 2012 WL 1097350, at *10 (S.D.N.Y. Mar. 31, 2012))). It simply will not do for Defendants to raise an issue on Reply without giving Plaintiffs a fulsome opportunity to respond. And, in any event, the Court cannot conclude—on the undeveloped record in this case—that, as a matter of law, the Parties had an implicit agreement that rendered the Bag Fees the Plaintiffs' full remuneration for their work at Hudson National. Thus, the Court concludes that this issue will benefit from further factual development through discovery. (*Accord Hopkins* Ruling 15:7–8.)[12]

---

[11] DOL's June 25, 2020 Opinion Letter is available on the docket for this case. (*See* Gross Aff. Ex. C at 8–11 (Dkt. No. 41-3).)

[12] In their opening brief, Defendants assert, in essence, that Hudson National members "are the Club," such that the members' Bag Fees functionally were wages paid by the Club. (Defs' Mem. 19 (emphasis omitted).) That assertion is unavailing. As an initial matter, Plaintiffs responded to this argument in their Opposition, (Pls' Opp'n 18–19), but Defendants did

In sum, the Court denies Defendants' Motion to the extent that it seeks dismissal of Plaintiffs minimum wage claims.

### b.  Overtime Claims

The Court next addresses Defendants' assertion that Plaintiffs' overtime claims must be dismissed because Plaintiffs failed "to adequately plead any facts showing they worked overtime during a specific workweek and the number of alleged overtime hours they worked during a specific workweek."  (Defs' Mem. 20.)

Under the FLSA, "no employer shall employ any [] employees . . . for a workweek longer than forty hours" unless the employee receives compensation for his employment in excess of forty hours "at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  "[I]n order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours."  *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013); *see also Garcia v. 2390 Creston Realty LLC*, No. 23-CV-1129, 2024 WL 2959254, at *4 (S.D.N.Y. June 11, 2024) (same).  "[A] plaintiff must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week."  *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013).  "A plaintiff is not required

---

not counter that response on Reply, (*see generally* Defs' Reply); "[b]y failing to respond to [Plaintiffs'] argument in its Reply . . . , [Defendants] concede[] the point for purposes of [their Motion,]" *Vann v. Persico*, No. 20-CV-628, 2022 WL 4368110, at *9 (S.D.N.Y. Sept. 20, 2022) (quoting *Cornelius v. Macy's Retail Holdings, Inc.*, No. 18-CV-678, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019) (collecting cases)).  And, in any event, Defendants' argument in this regard fails to make par, as Defendants have not pointed to any persuasive, much less binding, authority supporting the notion that private golf club members are joint employers capable of fulfilling a club's minimum wage obligations.  (Defs' Mem. 19.)

to 'keep careful records and plead their hours with mathematical precision.'" *Fallon v. 18 Greenwich Ave., LLC*, No. 19-CV-9579, 2021 WL 1105066, at *5 (S.D.N.Y. Mar. 23, 2021) (quoting *Dejesus v. HF Mgmt. Servs. LLC*, 726 F.3d 85, 90 (2d Cir. 2013)); *see also Stewart v. Summit Health Mgmt., LLC*, No. 23-CV-4073, 2024 WL 3274687, at *4 (S.D.N.Y. July 1, 2024) (same); *Nam v. Ichiba Inc.*, No. 19-CV-1222, 2021 WL 878743, at *6 (E.D.N.Y. Mar. 9, 2021) (noting that a plaintiff "does not need to actually estimate the number of hours he [or she] worked in 'some or all workweeks'" (quoting *Dejesus*, 726 F.3d at 90)). "Instead, a plaintiff must provide 'sufficient factual allegations rather than a general and conclusory allegation as to the number of hours "routinely" worked—whereby the [c]ourt can reasonably infer that there was indeed one or more particular workweek(s) in which the plaintiff suffered an overtime violation.'" *Fallon*, 2021 WL 1105066, at *5 (quoting *Humphrey v. Rav Investigative & Sec. Servs. Ltd.*, 169 F. Supp. 3d 489, 496 (S.D.N.Y. 2016)).

With respect to the pleading standard applicable to claims for unpaid overtime under the FLSA, the Second Circuit recently clarified that "[s]o long as the complaint adequately alleges that [] each [plaintiff] worked more than forty hours each week they were employed . . . that is enough to state a claim under the FLSA and defeat a motion to dismiss." *Herrera v. Comme des Garcons, Ltd.*, 84 F.4th 110, 112 (2d Cir. 2023). Put another way, "[w]here [ p]laintiffs plausibly allege that they *worked more than forty hours per week as part of their regularly scheduled workweek*, they have adequately stated a claim under the FLSA and *need not list the specific workweeks* during which they worked more than forty hours." *Id.* (emphases added).

The facts in *Herrera* are instructive. There, the plaintiffs—who claimed they "were not paid an overtime premium for hours worked in excess of forty hours a week"—alleged that their "regularly-scheduled hours consisted of five shifts a week[,]" which, in general, ran from either

9:00 a.m. to 6:00 p.m. or 10:15 a.m. to 7:00 p.m. *Id.* (citation omitted).  Thus, as alleged, the

plaintiffs in *Herrera* "worked four–five hours in excess of forty hours per week purely from their

ostensible schedule[.]" *Id.* (citation omitted).  Further, these plaintiffs averred that they

"frequently worked additional hours" when, for example, they spent "approximately five hours

per week" engaging in various after-hours duties, or "an additional three hours per week

handling shipments of new merchandise[.]" *Id.* (quotation marks and citation omitted).  In

reversing the district court and concluding that the plaintiffs had stated a plausible unpaid

overtime claim, the Second Circuit stated:

> The [c]omplaint alleges that the [p]laintiffs' regularly scheduled work hours
> consisted of five shifts each week, and that each shift lasted between eight and
> three-quarter hours and nine hours, amounting to between 43.75 hours and 45 hours
> of work per regular week.  That allegation itself gets us "beyond forty hours in any
> given workweek, and therefore to a plausible claim of overtime." *Dejesus*, 726
> F.3d at 89.  Other allegations . . . likewise independently support the claim that the
> [p]laintiffs' regular workweek exceeded forty hours and that they were thus entitled
> to overtime.  The [c]omplaint alleges, for example, that the [p]laintiffs regularly
> devoted an additional five hours per week to post-work duties, and an additional
> three hours per week to receiving shipments of merchandise . . . .  More specifically,
> the [c]omplaint alleges that the [p]laintiffs' "[e]arly arrivals and late departures
> comprised approximately an additional five hours of work per week in excess of
> forty hours per week."  Viewed singly or together, these allegations carry the
> [p]laintiffs over the forty-hour bar and permit us to infer that they were entitled to
> overtime under the FLSA.

*Id.* at 115 (alteration adopted) (citation omitted).

So too here.  In the Amended Complaint, Plaintiffs alleged each of their weekly

schedules for the months they caddied—that is, April to November—for the years during which

they worked at Hudson National.  (*See generally* AC ¶¶ 355, 357–492; *see also* Defs' Mem. 9–

12 (setting forth—based on the allegations in the Amended Complaint—the number of hours

each Plaintiff worked each week in the months during which they worked at Hudson National).)

As described above, with limited exceptions, each Plaintiff not only worked more than forty

hours per week, but in fact worked more than fifty, sixty, and sometimes seventy hours per week.

*See supra* Section I.A.4.  And, as noted, Plaintiffs have plausibly alleged that they received *no*

pay from Defendants for their time worked, much less wages at "one and one-half times [their]

regular rate" for any hours worked beyond forty hours per week.  29 U.S.C. § 207(a)(1); *see*

*supra* Section II.B.1.a.  Simply put, "[a]ccepting [Plaintiffs'] allegation as true and drawing all

reasonable inferences in [their] favor" as the Court must at this early stage in the case, *Herrera*,

84 F.4th at 116, Plaintiffs have plausibly alleged unpaid-overtime claims because they have

averred "that their regularly scheduled workweek[s] . . . included more than forty hours of work,

so that they were eligible for overtime during every week in which they worked their regular

schedule[,]" *Stewart*, 2024 WL 3274687, at *4 (quoting *Herrera*, 84 F.4th at 117); *see also*

*Herrera*, 84 F.4th at 115 (determining that the plaintiffs' allegations that their "regularly

scheduled work hours consisted of five shifts each week, and that each shift lasted between eight

and three-quarter hours and nine hours, amounting to between 43.75 hours and 45 hours of work

per regular week" permitted the inference "that they were entitled to overtime under the FLSA");

*Montoya v. Havana Cent. NY 2, LLC*, No. 23-CV-111, 2024 WL 874640, at *9 (S.D.N.Y. Jan. 8,

2024) (determining that the plaintiff "ha[d] pled a plausible overtime claim by alleging that he

worked over forty hours for each week of his employ but was paid a fixed weekly salary that did

not encompass overtime" (citation omitted)), *report and recommendation adopted*, 2024 WL

871206 (S.D.N.Y. Feb. 29, 2024); *Alarcon Adame v. Evir Corp.*, No. 18-CV-2969, 2019 WL

3287086, at *1–3 (S.D.N.Y. July 22, 2019) (concluding that a restaurant delivery worker met the

applicable pleading standard by alleging "the approximate start times, end times, and number of

days per week worked" during the time he was employed, e.g., that "between June 2017 and

October 2017, the p]laintiff worked from approximately 3:00 p.m. until 11:00 p.m., six days per

week, averaging 48 hours per week"); *Werst v. Sarar USA Inc.*, No. 17-CV-2181, 2018 WL

1399343, at *6 (S.D.N.Y. Mar. 16, 2018) (determining that the plaintiff met her pleading burden where she alleged that her "standard workweek was from 10:00 a.m. to 6:00 p.m., however, she routinely was required to work late, typically at least once or twice a week to 8:00 p.m. or 9:00 p.m."); *Kuck v. Planet Home Lending, LLC*, 354 F. Supp. 3d 162, 168 (E.D.N.Y. 2018) (finding that allegations that the plaintiffs "worked 50–55 hours during every single week of their employment," e.g., "[f]rom August 3, 2013 through July 22, 2017, [one plaintiff] worked 10 hours each day, with a half hour meal break, six days a week" without receiving overtime compensation, "clearly satisfy the Second Circuit's edict that a complaint contain specificity as to uncompensated hours worked during a particular week").

The Court is unconvinced by Defendants' apparent reliance on a litany of cases—that pre-date *Herrera*—dismissing overtime claims, which they did not even bother to tether to the facts of *this* case (and for which they failed to provide pincites).  (Defs' Mem. 20–21.) Defendants' cases are clearly distinguishable on their facts.  *See Knight v. MTA-N.Y.C. Transit Auth.*, No. 19-CV-9960, 2021 WL 2435577, at *3–4 (S.D.N.Y. June 15, 2021) (dismissing the plaintiff's FLSA overtime claim where her amended complaint did "little more than recite the statutory requirements of the FLSA"), *aff'd*, No. 21-1700-CV, 2022 WL 839277 (2d Cir. Mar. 22, 2022) (summary order); *Mokrov v. Aeroflot Russian Airlines*, No. 20-CV-588, 2021 WL 2435801, at *4 (S.D.N.Y. June 15, 2021) (concluding that the plaintiffs failed to state a plausible FLSA overtime claim where they "[did] not specify, even approximately, how many hours in excess of forty that they worked per week or when they were required to do so"); *Limauro v. Consol. Edison Co. of N.Y., Inc.*, No. 20-CV-3558, 2021 WL 1226872, at *1–2 (S.D.N.Y. Mar. 31, 2021) (dismissing the plaintiff's FLSA and NYLL overtime claims because his "allegations lack[ed] specificity as to *when* [he] was required to work more than forty hours a week or the

*frequency* with which he did so[,]" where the plaintiff had made "general assertions about how he 'typically' worked 45 hours per week, or how he would 'often' arrive to work early" (emphases in original)); *Mendoza v. Cornell Univ.*, No. 20-CV-2110, 2021 WL 918622, at *3–4 (S.D.N.Y. Mar. 10, 2021) (dismissing the plaintiff's FLSA overtime claim where her standard workweek was *less than* 40 hours, she "sometimes" worked an extra shift on weekends, and her complaint otherwise failed to identify a single week where she worked more than 40 hours but was not remunerated for that time); *Paleja v. KP NY Operations LLC*, No. 20-CV-475, 2021 WL 148948, at *2 (S.D.N.Y. Jan. 15, 2021) (dismissing an FLSA overtime claim where the plaintiff only alleged that he "regularly worked in excess of 40 hours per week" (citation omitted)), *aff'd*, No. 21-286-CV, 2022 WL 364007 (2d Cir. Feb. 8, 2022) (summary order).

On Reply, Defendants respond to this issue in a wholly tepid manner, merely parroting the truism in *Herrera* that "[t]he specificity requirement [for FLSA claims] is no minor hurdle[;] [p]roperly applied, it imposes meaningful constraints on FLSA overtime claims, aiming to separate meritless claims from genuine ones." (Defs' Reply 14 (alterations added) (quoting *Herrera*, 84 F.4th at 117–18).) Indeed, Defendants *ignore* the Second Circuit's instruction that a plaintiff "need not list the specific workweeks during which they worked more than forty hours[,]" *Herrera*, 84 F.4th at 112, and instead double-down on the (flawed) assertion that Plaintiffs needed to "identify a *specific workweek* in which overtime hours were allegedly worked and the approximate number of such hours[,]" (Defs' Reply 14 (emphasis added).)

Accordingly, Defendants' Motion is denied insofar as it seeks dismissal of Plaintiffs' unpaid overtime claims.

### 2. Statute of Limitations

Finally, Defendants note—somewhat offhandedly—that Nigro, Moore, Johnson, and Brewer's FLSA claims are untimely. (*See* Defs' Mem. 13 n.6.)[13] The Court agrees.

"The FLSA statute of limitations is two years for non-willful violations and three years for willful violations." *Tung v. Banzai Steakhouse Inc.*, No. 22-CV-5750, 2023 WL 5827643, at *6 (S.D.N.Y. Sept. 8, 2023) (citing 29 U.S.C. § 255(a)); *accord Cucul*, 2024 WL 2783505, at *6 ("The FLSA's limitations period for minimum wage and overtime claims is two years, unless the employer's violation is willful, in which case the period is three years." (quoting *Mendez v. MCSS Rest. Corp.*, 564 F. Supp. 3d 195, 208 (E.D.N.Y. 2021))). With regard to willfulness, the Second Circuit has explained that "[a]n employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 324 (2d Cir. 2021) (quotation marks omitted) (quoting *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009)); *see also Agureyev v. H.K. Second Ave. Rest. Inc.*, No. 17-CV-7336, 2018 WL 4356731, at *2 (S.D.N.Y.

---

[13] It can hardly be said that the perfunctory manner in which Defendants raised the statute-of-limitations issue properly placed it before the Court. *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2024 WL 3159846, at *2 n.2 (S.D.N.Y. June 25, 2024) ("Issues not sufficiently argued in the briefs are considered waived." (quoting *Am. Tissue, Inc. v. DLJ Merch. Banking Partners, II, L.P.*, No. 03-CV-6913, 2006 WL 1084392, at *6 (S.D.N.Y. Apr. 20, 2006))); *see also Piotrowski v. Rocky Point Union Free Sch. Dist.*, No. 18-CV-6262, 2023 WL 2710341, at *13 (E.D.N.Y. Mar. 30, 2023) (holding, where the party had only made passing references to its argument in its briefing, that the party's argument was "so underdeveloped that the [c]ourt deem[ed] it waived" (citation omitted)). Nevertheless, "a court may raise a statute of limitations defense sua sponte when the facts supporting the statute of limitations defense are set forth in the papers plaintiff[s] [themselves] submitted." *Cucul v. Major Cleaning, Inc.*, No. 22-CV-601, 2024 WL 2783505, at *6 (E.D.N.Y. May 30, 2024) (alteration adopted) (italics, quotation marks, and citation omitted) *see also Kone v. Joy Constr. Corp.*, No. 15-CV-1328, 2016 WL 866349, at *2 (S.D.N.Y. Mar. 3, 2016) (noting that "dismissal on statute of limitations grounds is proper only where a complaint plainly appears time-barred on its face" (citing *Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999))).

Sept. 12, 2018) ("[A] plaintiff must show more than that a defendant should have known it was violating the law. Should have known implies negligence or [a] reasonable person standard. Reckless disregard, in contrast, involves actual knowledge of a legal requirement and deliberate disregard of the risk that one is in violation." (citation omitted)).

Here—even if Defendants' alleged FLSA violations were willful[14]—Nigro, Moore, Johnson, and Brewer's FLSA claims are time-barred. This Action was filed on January 20, 2023. (*See* Compl.) Thus, any alleged FLSA violation must have occurred no earlier than January 20, 2020. *See* 29 U.S.C. § 255(a). However, Nigro, Moore, Johnson, and Brewer stopped working at Hudson National well before that date; specifically, Nigro departed in August 2018, (AC ¶ 12), Moore departed in September 2017, (*id.* ¶ 16), Johnson departed (for the second time) in August 2019, (*id.* ¶ 24), and Brewer departed on approximately July 4, 2017, (*id.* ¶ 39). Thus, Nigro, Moore, Johnson, and Brewer's FLSA claims must be dismissed as time-barred.

Because the statute of limitations for Nigro, Moore, Johnson, and Brewer's NYLL claims is six years, those claims are not time-barred. *See Cucul*, 2024 WL 2783505, at *6. However, Plaintiffs do not claim that the Court may exercise its diversity jurisdiction here, so the Court must determine whether to exercise supplemental jurisdiction over these Plaintiffs' NYLL claims.

"[F]ederal courts may, and often do exercise supplemental jurisdiction over state labor law claims, even when those employees' FSLA claims have been dismissed as time-barred[.]" *Cano v. Four M Food Corp.*, No. 08-CV-3005, 2009 WL 5710143, at *11 (E.D.N.Y. Feb. 3,

---

[14] To be clear, the Court need not—and does not—opine on whether Plaintiffs plausibly alleged willful FLSA violations in connection with deciding the instant Motion.

2009) (collecting cases) (quoting *Wraga v. Marble Lite, Inc.*, No. 05-CV-5038, 2006 WL 2443554, at *3 (E.D.N.Y. Aug. 22, 2006)); *see also Wraga*, 2006 WL 2443554, at *3 (collecting cases); *Chen v. Street Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 276 (E.D.N.Y. 2005) (exercising supplemental jurisdiction over two plaintiffs' state law claims, notwithstanding the fact that their FLSA claims were time-barred); *Ouedraogo v. Durso Assocs.*, No. 03-CV-1851, 2005 WL 1423308, at *2 (S.D.N.Y. June 16, 2005) (exercising supplemental jurisdiction over a plaintiff with only NYLL claims, finding that those claims "share[d] too many common threads with the other plaintiffs' federal claims for them to be separated from one another").  That is so, at least in part, because state labor law claims tend to "aris[e] from the same nucleus of operative fact" as corresponding FLSA claims.  *See Shibetti v. Z Rest., Diner & Lounge, Inc.*, No. 18-CV-856, 2022 WL 103639, at *2 (E.D.N.Y. Jan. 11, 2022) ("Courts have maintained supplemental jurisdiction over an opt-in plaintiffs' NYLL claims when they share a common nucleus of operative fact with another plaintiffs' FLSA claims."); *Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580, 593 (S.D.N.Y. 2020) (exercising supplemental jurisdiction where non-FLSA plaintiffs' NYLL claims and the other plaintiffs' FLSA claims "involve[d] the same issues of hours and payments for plaintiffs who were employed in the same jobs, doing the same work, for the same employers").

Given that the NYLL and FLSA claims at issue stem from an indisputably common nucleus of operative fact—namely, Hudson National's various alleged wage-and-hour deficiencies with respect to its caddies—the Court will exercise supplemental jurisdiction over Nigro, Moore, Johnson, and Brewer's NYLL claims.  *See Cucul*, 2024 WL 2783505, at *6 (declining to dismiss NYLL claims—after finding that corresponding FLSA claims were time-barred—because "the values of judicial economy, convenience, fairness, and comity" weighed in

31

favor of retaining supplemental jurisdiction over those claims); *accord Fallon*, 2021 WL

1105066, at *7–8 (exercising supplemental jurisdiction over one plaintiff's NYLL claims after

dismissing his FLSA claims because claims "derive[d] from the same common nucleus of

operative fact as the other [p]laintiffs' FLSA claims," in that they "[arose] out of the same

compensation policies and practices").

### III.  Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motion.

Specifically, the Motion is granted as to Nigro, Moore, Johnson, and Brewer's FLSA claims

only.  The Court will hold a telephonic initial conference in this case on October, 24, 2024 at

12:30 p.m.  *See* Individual Rules of Practice of the Honorable Kenneth M. Karas § III.B.

The Clerk of Court is respectfully directed to terminate the pending Motion.  (*See* Dkt.

No. 39.)

SO ORDERED.

Dated:    September 19, 2024
          White Plains, New York

_____
      KENNETH M. KARAS
      United States District Judge