UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID ANDERSON, MICHAEL NIGRO, TROY MOORE, JOSEPH MCGOVERN, ROSS JOHNSON, SIYA DUMA, and CONRAD BREWER, *on behalf of themselves and all others similarly situated*, | Case No.: 7:23-cv-00522 (KMK) |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| -against- | **COLLECTIVE AND CLASS ACTION** |
| THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club"), THERON C. HARVEY, RICHARD HARDIN, and KEVIN MCCONAUGHY, | |
| Defendant. | |

Plaintiffs, DAVID ANDERSON, MICHAEL NIGRO, TROY MOORE, JOSEPH MCGOVERN, ROSS JOHNSON, SIYA DUMA, and CONRAD BREWER, individually and on behalf of all others similarly situated, by his attorneys, upon personal knowledge as to themselves and upon information and belief as to all other matters, complaining of Defendants, THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club"), and THERON C. HARVEY, RICHARD HARDIN, and KEVIN MCCONAUGHY (collectively "Defendants") alleges:

1. **NATURE OF ACTION**

1. This is a wage and hour employee misclassification action that led to improper wages and an action for unlawful retaliation due to the actions of the employer in response to the protected complaints regarding the improper classification. This action seeks to recover unpaid minimum and overtime wages, spread of hours, statutory and liquidated damages, damages for emotional distress, punitive damages, and other monies pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA"), and the New York Labor Law § 190, et seq. ("NYLL").

2.      Hudson National Golf Club is an exclusive golf club, 18-hole course, and restaurant. Plaintiffs and similarly situated employees worked as golf caddies at Hudson National Golf Club. Defendants are the corporate entity which operates the Club, the Director of Club Operations, and Caddie Masters—all of whom are employers as a matter of economic reality.

3.      Defendants maintain formal and functional control over caddies like Plaintiff, David Anderson. Hudson National Golf Club requires golfers to use its caddies. And caddies are an integral to the golfing experience at Hudson National Golf Club, which is a walking course. Defendants control the caddie hiring process and exercise power to hire and fire caddies. Defendants issued written work schedules to caddies that directed caddies to work specific shifts at specific dates, times, and locations at Hudson National Golf Club. Caddies were directed to arrive early, or on time. Caddies were reprimanded for lateness. And caddies were frequently required to remain on duty waiting for golfers to arrive for tee times. Defendants supervised and directed caddies in performing caddie and non-caddie work. Defendants also exercise control over the rate and method of payment for caddies and discouraged caddies from discussing compensation with golfers. Caddies do not own independent business entities and make little, if any, upfront investment in caddying. Moreover, caddies were required to obey a dress code and wear uniforms emblazoned with Hudson National Golf Club logos.

4.      Despite maintaining formal and functional control over the caddies, Defendants did not pay caddies for their regular work. Instead, Defendants misclassified caddies as "independent contractors," to evade the costs and responsibilities of employment.

## 2.  **JURISDICTION**

5.      This Court has subject matter jurisdiction of this case pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331 and 1337, and has supplemental jurisdiction over Plaintiff, David Anderson's claims under the NYLL pursuant to 28 U.S.C. § 1367.

**3.  VENUE**

6.      Venue is proper in the Southern District of New York under 28 U.S.C. § 1391, as the Hudson National Golf Club is in the Southern District of New York.

**4.  THE PARTIES**

**4.1.  PLAINTIFFS**

7.      Plaintiffs are current and former golf caddies and employee(s) at Hudson National Golf Club who were misclassified and deprived of the wages and benefits to which employees are entitled under the FLSA and NYLL.

**4.1.1. Plaintiff David Anderson**

8.      Plaintiff, David Anderson, worked for Hudson National Golf Club as a golf caddie from approximately 2005 to approximately June 23, 2021.

9.      Plaintiff, David Anderson, was engaged in the production or in the handling or selling of, or otherwise working on, goods or materials that have been moved in or produced for commerce.

10.     A written consent form for Plaintiff, David Anderson, was filed with this collective and class action complaint.

11.     Throughout his employment, Plaintiff, David Anderson, was an employee within the meaning of the FLSA and NYLL.

12.     Plaintiff, David Anderson engaged in protected conduct by filing and participating in this instant action under the Fair Labor Standards Act (FLSA) and NYLL lawsuit against Plaintiff HUDSON NATIONAL GOLF CLUB INC.

**4.1.2.  Plaintiff Michael Nigro**

13.     Plaintiff, Michael Nigro, worked for Hudson National Golf Club as a golf caddie from approximately April 1, 2015, to August 2018.

14.    Plaintiff, Michael Nigro, was engaged in the production or in the handling or selling of, or otherwise working on, goods or materials that have been moved in or produced for commerce.

15.    A written consent form for Plaintiff, Michael Nigro, was filed with this collective and class action complaint.

16.    Throughout his employment, Plaintiff, Michael Nigro, was an employee within the meaning of the FLSA and NYLL.

### 4.1.3.  **Plaintiff Troy Moore**

17.    Plaintiff, Troy Moore, worked for Hudson National Golf Club as a golf caddie from approximately April 2012 to September 2017.

18.    Plaintiff, Troy Moore, was engaged in the production or in the handling or selling of, or otherwise working on, goods or materials that have been moved in or produced for commerce.

19.    A written consent form for Plaintiff, Troy Moore, was filed with this collective and class action complaint.

20.    Throughout his employment, Plaintiff, Troy Moore, was an employee within the meaning of the FLSA and NYLL.

### 4.1.4.  **Plaintiff Joseph McGovern**

21.    Plaintiff, Joseph McGovern, worked for Hudson National Golf Club as a golf caddie from approximately October 1, 2013, to May 30, 2022.

22.    Plaintiff, Joseph McGovern, was engaged in the production or in the handling or selling of, or otherwise working on, goods or materials that have been moved in or produced for commerce.

23.    A written consent form for Plaintiff, Joseph McGovern, was filed with this collective and class action complaint.

4

24.    Throughout his employment, Plaintiff, Joseph McGovern, was an employee within the meaning of the FLSA and NYLL.

### 4.1.5.  **Plaintiff Ross Johnson**

25.    Plaintiff, Ross Johnson, worked for Hudson National Golf Club as a golf caddie from approximately 2007 to November 2017, and from April 2019 to August 2019.

26.    Plaintiff, Ross Johnson, was engaged in the production or in the handling or selling of, or otherwise working on, goods or materials that have been moved in or produced for commerce.

27.    A written consent form for Plaintiff, Ross Johnson, was filed with this collective and class action complaint.

28.    Throughout his employment, Plaintiff, Ross Johnson, was an employee within the meaning of the FLSA and NYLL.

29.    Plaintiff Ross Johnson worked in outside services for Hudson National Golf Club from approximately April 2018 to October 2020.

30.    While working in outside services, Plaintiff, Ross Johnson, performed physical work responsibilities including, inter alia, greeting members and guests at the Hudson National Golf Club, maintaining the golf cart fleet, moving golf carts, working on his feet and with his hands, monitoring pace of play, monitoring the driving ranges for cleanliness, repairing divots, fixing ball marks, and cleaning.

31.    While working as an outside service professional, Plaintiff, Ross Johnson, spent more than 25% of his working time engaged in physical labor.

### 4.1.6.  **Plaintiff Joseph McGovern**

32.    Plaintiff, Joseph McGovern, worked for Hudson National Golf Club as a golf caddie from approximately 2012 to May 2022.

33.    Plaintiff, Joseph McGovern, was engaged in the production or in the handling or selling of, or otherwise working on, goods or materials that have been moved in or produced for commerce.

34.    A written consent form for Plaintiff, Joseph McGovern, was filed with this collective and class action complaint.

35.    Throughout his employment, Plaintiff, Joseph McGovern, was an employee within the meaning of the FLSA and NYLL.

### 4.1.7.  Plaintiff Siya Duma

36.    Plaintiff, Siya Duma, worked for Hudson National Golf Club as a golf caddie from approximately July 2019 to August 2022.

37.    Plaintiff, Siya Duma, was engaged in the production or in the handling or selling of, or otherwise working on, goods or materials that have been moved in or produced for commerce.

38.    A written consent form for Plaintiff, Siya Duma, was filed with this collective and class action complaint.

39.    Throughout his employment, Plaintiff, Siya Duma, was an employee within the meaning of the FLSA and NYLL.

### 4.1.8.  Plaintiff Conrad Brewer

40.    Plaintiff, Conrad Brewer, worked for Hudson National Golf Club as a golf caddie from approximately May of 2016 to July 4, 2017.

41.    Plaintiff, Conrad Brewer, was engaged in the production or in the handling or selling of, or otherwise working on, goods or materials that have been moved in or produced for commerce.

42.    A written consent form for Plaintiff, Conrad Brewer, was filed with this collective and class action complaint.

43.     Throughout his employment, Plaintiff, Conrad Brewer, was an employee within the meaning of the FLSA and NYLL.

**4.2. <u>DEFENDANTS</u>**

**4.2.1.   <u>Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club")</u>**

44.     Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") is a New York not-for-profit corporation that owns, operates, and does business as the "Hudson National Golf Club," a golf course located at 40 Arrowcrest Drive, Croton on Hudson, New York 10520.

45.     Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") had an annual gross volume of sales in excess of $500,000 within the three years prior to the filing of this Complaint.

46.     Upon information and belief, Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") earned approximately $10,022,741 in total revenue in 2020.

47.     Upon information and belief, the membership fee to join the Hudson National Golf Club can reach $100,000.

48.     Upon information and belief, membership dues may exceed $30,000 per year.

49.     Hudson National Golf Club is an "enterprise engaged in interstate commerce" within the meaning of the FLSA.

50.     Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") is an "enterprise engaged in interstate commerce" within the meaning of the FLSA.

51.     Hudson National Golf Club included a "restaurant," as defined in N.Y. Comp. Codes R. & Regs. tit. 12, § 146-3.1.

52.     Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") is a covered employer within the meaning of the FLSA and the NYLL, and, at all times relevant, employed Plaintiffs similarly situated employees.

53.     Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") exercised control, oversight, and direction over Plaintiffs and similarly situated employees.

54.     Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") had power to hire and fire Plaintiff, David Anderson, and similarly situated caddies.

55.     Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") applied the same employment policies, practices, and procedures to all caddies, including policies, practices, and procedures with respect to payment of minimum wage, overtime compensation, spread of hours, and recordkeeping.

56.     Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") harassed, abused, and otherwise discriminated against Plaintiff David Anderson because of his participation in the instant FLSA and NYLL lawsuit.

### 4.2.2.  **Defendant THERON C. HARVEY - Director of Club Operations**

57.     Defendant THERON C. HARVEY is the Director of Club Operations at Hudson National Golf Club.

58.     Defendant THERON C. HARVEY has been the Director of Club Operations at Hudson National Golf Club since approximately 2014.

59.     Defendant THERON C. HARVEY has a Bachelor of Business Degree in Professional Golf Management and Marketing from New Mexico State University.

60.    Defendant THERON C. HARVEY is the liquor license principal for the Hudson National Golf Club.

61.    Defendant THERON C. HARVEY regularly corresponded using the email tharvey@hudsonnational.org.

62.    Upon information and belief, Defendant THERON C. HARVEY directed caddies in how to enforce golf rules at the Hudson National Golf Club.

63.    Upon information and belief, Defendant THERON C. HARVEY participated in enforcing the requirement that all caddies wear uniforms.

64.    Upon information and belief, Defendant THERON C. HARVEY continued the requirement that caddies refer to members and guests as "Mr." and "Mrs."

65.    Upon information and belief, Defendant THERON C. HARVEY established policies that caddies must play a larger role in policing play of golfers, for instance in enforcing the pace of play rules.

66.    Upon information and belief, Defendant THERON C. HARVEY established policies that caddies must report slow play and poor etiquette of golfers.

67.    Defendant THERON C. HARVEY played a principal role in streamlining daily operations of Hudson National Golf Club, which included caddie operations.

68.    Upon information and belief, Defendant THERON C. HARVEY issued instructions to the Caddie Master who then directed caddies, such as Plaintiff, David Anderson. For example, Defendant THERON C. HARVEY directed the Caddie Master to instruct caddies to park in certain locations to accommodate members and guests.

69.    Upon information and belief, Defendant THERON C. HARVEY regularly met with the board of directors at Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club").

70.     When the COVID19 pandemic required restrictive business practices, Defendant THERON C. HARVEY, and the board of Defendant THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") established instructions that were sent to caddies that staff would not be allowed on property and golfers would carry their own bags.

71.     Upon information and belief, Defendant THERON C. HARVEY had power to hire caddies. For example, Defendant, THERON C. HARVEY, would direct the Caddie Master who to hire and not hire.

72.     Defendant, THERON C. HARVEY's recommendations for hiring were given particular weight.

73.     Upon information and belief, Defendant THERON C. HARVEY has power to fire caddies. For example, upon information and belief, Defendant THERON C. HARVEY had an argument with a caddie and terminated the caddie.

74.     For instance, Defendant THERON C. HARVEY fired Plaintiff Siya Duma.

75.     Defendant, THERON C. HARVEY, has hired one or more Caddie Masters.

76.     Defendant, THERON C. HARVEY, has fired one or more Caddie Masters.

77.     Defendant THERON C. HARVEY has the power to supervise and discipline caddies. For example, if a caddie was the subject of a complaint, then Defendant, THERON C. HARVEY, would meet with the caddie and review the situation.

78.     Upon information and belief, Defendant THERON C. HARVEY determined the rate and method of payment to caddies. For example, upon information and belief, when outings or events occurred, Defendant, THERON C. HARVEY, was involved in setting the rate of pay for caddies.

79.     Defendant THERON HARVEY exercised sufficient control over the operations of the Hudson National Golf Club caddie operations to be considered Plaintiff, David Anderson's, and similarly situated caddies' employer under the FLSA and NYLL.

80.     Defendant THERON C. HARVEY is an employer under the FLSA and NYLL.

### 4.2.3.  **Defendant RICHARD HARDIN – Caddie Master**

81.     Defendant RICHARD HARDIN worked as a Caddie Master at the Hudson National Golf Club from approximately 2004 to approximately 2017.

82.     Defendant RICHARD HARDIN participated in hiring Plaintiff, David Anderson.

83.     Upon information and belief, Defendant RICHARD HARDIN participated in hiring caddies.

84.     Defendant RICHARD HARDIN participated in supervising Plaintiff, David Anderson, and similarly situated caddies.

85.     As Caddie Master, Defendant RICHARD HARDIN set the work schedules of Plaintiff, David Anderson, and similarly situated caddies.

86.     As Caddie Master, Defendant RICHARD HARDIN paid Plaintiff, David Anderson, and similarly situated caddies.

87.     As Caddie Master, Defendant RICHARD HARDIN had power over caddies to hire, fire, set schedules, set terms and conditions of employment, set the rate and method of compensation, and maintain employment records (if any).

88.     Defendant RICHARD HARDIN hired Plaintiff Michael Nigro.

89.     In approximately 2016 or 2017, Defendant, RICHARD HARDIN, threatened to fire Plaintiff, David Anderson when Plaintiff, David Anderson, attempted to review information that would indicate whether Plaintiff, David Anderson, would be working another round of golf.

90.     Defendant RICHARD HARDIN exercised sufficient control over the operations of the Hudson National Golf Club caddie operations to be considered Plaintiffs' and caddies' employer under the FLSA and NYLL.

91.     Defendant RICHARD HARDIN is an employer under the FLSA and NYLL.

### 4.2.4.     Defendant KEVIN MCCONAUGHY – Caddie Master

92.     Defendant KEVIN MCCONAUGHY worked as a Caddie Master at the Hudson National Golf Club from approximately 2017 to approximately June of 2021.

93.     Defendant KEVIN MCCONAUGHY participated in supervising Plaintiff, David Anderson, and similarly situated caddies.

94.     As Caddie Master, Defendant KEVIN MCCONAUGHY set the work schedules of Plaintiff, David Anderson, and similarly situated caddies.

95.     As Caddie Master, Defendant KEVIN MCCONAUGHY paid Plaintiff, David Anderson, and similarly situated caddies.

96.     As Caddie Master, Defendant KEVIN MCCONAUGHY had power over caddies to hire, fire, set schedules, set terms and conditions of employment, set the rate and method of compensation, and maintain employment records (if any).

97.     Defendant KEVIN MCCONAUGHY terminated Plaintiff Michael Nigro.

98.     Defendant KEVIN MCCONAUGHY exercised sufficient control over the operations of the Hudson National Golf Club caddie operations to be considered Plaintiff, David Anderson's, and caddies' employer under the FLSA and NYLL.

99.     Defendant KEVIN MCCONAUGHY is an employer under the FLSA and NYLL.

5. **FACTUAL ALLEGATIONS**

   5.1. **Defendants' Employment Practices**

      5.1.1.**CADDIE MASTER - Hudson National Golf Club Employed a "Caddie Master."**

100.    The Hudson National Golf Club employed a "Caddie Master."

101.    The Hudson National Golf Club "Caddie Master" was an employee of Hudson National Golf Club.

102.    The position as "Caddie Master" was designated by that title on email signatures.

103.    The Hudson National Golf Club "Caddie Master" was an employee of Defendant, THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club").

104.    The "Caddie Master" emailed caddies from an email which ended "@hudsonnational.org."

105.    Upon information and belief, Hudson National Golf Club provided the email account which ended "@hudsonnational.org," to the Caddie Master.

106.    Upon information and belief, Hudson National Golf Club controlled the email account which ended "@hudsonnational.org."

107.    Upon information and belief, Hudson National Golf Club had power to grant and revoke access to email accounts ending in "@hudsonnational.org."

108.    Each Caddie Master had power to hire.

109.    Applicants for caddie jobs were directed to the Caddie Master for the hiring process.

110.    For example, Plaintiff, David Anderson, was hired by Defendant RICHARD HARDIN, who was the Caddie Master.

111.    Plaintiff Siya Duma was hired by Defendant KEVIN MCCONAUGHY.

112.    The Hudson National Golf Club website directed applicants for caddie jobs to the Caddie Master for the hiring process.

113.    The Caddie Master issued written and verbal reprimands to Plaintiff, David Anderson, and similarly situated caddies.

114.    The Caddie Master issued written and verbal threats to fire caddies for actual or perceived infractions.

115.    The Caddie Master threatened to fire caddies for putting a golf club in the wrong golfer's bag.

116.    During the employment period, each Caddie Master supervised caddies and set their terms and conditions of employment at Hudson National Golf Club.

117.    The Caddie Master directed caddies on dress code,

118.    The Caddie Master directed caddies on attire.

119.    The Caddie Master directed caddies on uniform requirements.

120.    The Caddie Master directed caddies on when to arrive and when to arrive to work.

121.    The Caddie Master directed caddies on when the caddies could leave work.

122.    The Caddie Master reprimanded caddies for actual or perceived infractions, such as (for instance) putting golf clubs in the wrong player's bag, arriving "late" or leaving "early."

123.    The Caddie Master directed caddies to repair ball marks and bunkers, clean the caddie shack and golf carts, bring golfers beverages and items, and police the pace of play, among other directions.

124.    The Caddie Masters set caddies' work schedules.

125.    The Caddie Masters emailed written schedules to caddies that listed caddies' names, dates, and times of work.

126.    The Caddie Master identified which caddies would work and which would not.

127.    The Caddie Masters also directed caddies when to work and when to stay home if the schedule changed or if a "call-in" was needed.

128.    The Caddie Master assigned caddies to individual golfers.

129.    The Caddie Master also paid caddies for certain events.

130.    The Caddie Master paid caddies if a golfer paid the caddie through a Club account.

**5.1.2.    Defendants' Payroll Recordkeeping Practices.**

131.    Upon information and belief, Hudson National Golf Club failed to keep accurate records of the number of hours worked each day by each caddie.

132.    Upon information and belief, Hudson National Golf Club failed to keep accurate records of the number of hours worked each week by each caddie.

133.    Upon information and belief, Hudson National Golf Club failed to keep accurate records of the time of arrival and departure of each caddie for each work shift.

134.    Upon information and belief, Hudson National Golf Club failed to keep accurate records of the regular wages earned by caddies.

135.    Upon information and belief, Hudson National Golf Club failed to keep accurate records of overtime wages earned by each caddie.

136.    Upon information and belief, Hudson National Golf Club failed to keep accurate records of tip credits claimed as part of each caddies' wage.

137.    Upon information and belief, Hudson National Golf Club failed to distribute lawful and accurate tip credit notices to Plaintiffs and as required by the FLSA and NYLL.

138.    Upon information and belief, Hudson National Golf Club maintained copies of "chits," cash advances charged to accounts which record payments to caddies, like Plaintiff, David Anderson.

139.    Caddies were not given wage statements with each payment of wages as required by the NYLL.

140.    Caddies were not given a wage notice at the time of hiring or when rates of pay changed that, inter alia, accurately reflected his rate or rates of pay and number of hours worked per week, as required by the NYLL.

141.    In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the New York State legislature. Defendants' failure to provide such notices trivializes the importance of these notices in protecting Plaintiffs' interest in ensuring proper pay. Despite Defendants' conduct, there is a reason why the New York legislature concluded that enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. See N.Y. Spons. Mem., 2010 S.B. 8380. Written notices function as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Deprivation of such notices necessarily entails a significant risk of harm to the employees' concrete interest in being paid properly and timely.

142.    Here, Defendants' failure goes beyond generating a risk of harm to Plaintiffs and Class members. Defendants' conduct actually harmed Plaintiffs and Class members. Defendants' failure to provide paystubs listing all hours and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest Defendants' calculations, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiffs and Class members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Moreover, Defendants failure to provide wage notices allowed Defendants to hide the proper frequency of pay to employees. Defendants' failure to provide a wage notice to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

143.     Due to Defendants' failure to provide legally mandated notices such as earning statements and wage notices, Defendants were able to hide their wrongdoing from employees, and continued to attempt to hide their wrongdoing necessitating the current litigation. The failure to provide NYLL notices continues to result in delayed payment of all proper wages owed to Plaintiff and Class members.

### 5.1.3.   <u>Powers and Responsibilities of Liquor License Principals.</u>

144.     In New York, a liquor license grants the owner or possessor of the premises control over the food and beverage. N. Y. Alco. Bev. Cont. Law. § 106(1). These facts are sufficient to establish his right and ability to supervise the infringing activities.

145.     The rules and regulations associated with the liquor licensing process inherently create a collaborative relationship between the business and the principal officer's authority to provide a service as it relates to food and beverage.

146.     An individual's name listed as a principal on a liquor license suggests a general ability to supervise the establishment's operations and enjoy its profits.

147.     An individual's name listed as a principal on a liquor license also suggests (s)he keeps and maintains adequate records of all transactions involving the business transacted by such licensee which show the amount of alcoholic beverages, in gallons, purchased by such licensee together with the names, license numbers and places of business of the persons from whom the same were purchased, the amount involved in such purchases, as well as the sales of alcoholic beverages made by such licensee.

148.     According to the New York State Liquor Authority Handbook for Retail Licenses, the licensee is responsible for the activities of employees and patrons in all parts of the licensed premises, even if not always physically present.

149.     According to the New York State Liquor Authority Handbook for Retail Licenses, the licensee must keep adequate books and records of all transactions involving the licensed business, including records concerning employees, whether full or part time.

150.     According to the New York State Liquor Authority Handbook for Retail Licenses, the licensee is subject to disciplinary action whether he, or an employee, serves a visibly intoxicated person or minor, and accordingly is recommended to train employees concerning service of alcohol.

151.     In applying to hold a liquor license, the applicant must confirm the location of where alcohol is stored.

152.     The liquor license holder has a direct or indirect economic interest in the establishment.

153.     In applying to hold a liquor license, the applicant must confirm, among other items, whether the restaurant has a full kitchen and will serve full entrée like meals.

154.     In applying to hold a liquor license, the applicant must provide a diagram of the premises.

### 5.1.4.  **Caddies' Uniforms.**

155.     Hudson National Golf Club issued approximately three uniforms per year to caddies.

156.     The uniforms had a logo on the front which said the caddie's name and the club logo.

157.     Caddies were required to launder uniforms that Hudson National Golf Club issued and required to be worn.

158.     Caddies were not reimbursed for the costs of laundering uniforms provided by Hudson National Golf Club.

159.     Caddies were required to wear white shoes as part of the uniform.

### 5.1.5. **Caddies' Payments**

160.    Because Hudson National Golf Club did not consider its caddies to be employees, the caddies were not paid wages by Hudson National Golf Club.

161.    The only compensation that caddies received came directly from members and guests of the Hudson National Golf Club. https://www.hudsonnational.org/the-club/guest-rules.

162.    Members or guests were instructed that they "may compensate a caddie based upon the caddie's level of performance and the Member's degree of satisfaction." https://www.hudsonnational.org/the-club/guest-rules.

163.    Hudson National Golf Club stated, "the all-inclusive suggested Caddie Rate is $125 Per Bag for 18 Holes and $65 Per Bag for 9 Holes." https://www.hudsonnational.org/the-club/guest-rules.

164.    Hudson National Golf Club stated, "the caddie fee for golf professional staff is customarily paid by the member, members, or guests in their group." https://www.hudsonnational.org/the-club/guest-rules.

165.    While Hudson National Golf Club ostensibly prohibits its "employees" from accepting or soliciting gratuities, Hudson National Golf Club ostensibly excludes caddies from that policy. https://www.hudsonnational.org/the-club/guest-rules.

166.    Even though Hudson National Golf Club outwardly excluded caddies from the policy against accepting gratuities, at times caddies and Plaintiffs were told to return gratuities that guests had paid.

167.    While the "suggested" bag rate was $125 per round, golfers had the discretion to pay less than that amount and, at times, did so.

168.     If a golfer paid less than the suggested bag rate (or bag payment), then the caddie was at times told that it would be "made up next time" or the caddie master may take steps to obtain additional payment from the golfer to give to the caddie.

169.     The amount the golfer chooses to pay in a bag payment is contingent on the golfer's discretion and satisfaction with the caddie. The golfer could pay more than the suggested bag rate or less.

170.     Bag fees were paid directly from the golfers to caddies.

171.     Sometimes bag payments were paid in cash directly from the golfer to the caddie.

172.     For instance, approximately 15% of the golfers who worked with Plaintiff, David Anderson, paid bag payments in cash directly to Plaintiff, David Anderson.

173.     Hudson National Golf Club sometimes served as the conduit through which golfers paid caddies in the "chit" system. In this "chit" system, golfers could pay caddies the bag payment through a Club account. In the chit system, the Club withdrew funds from the golfer's account to pay the caddie.

174.     Whether paid in cash directly or by "chit," the bag payments are paid directly from golfers to the caddies.

175.     Upon information and belief, Hudson National Golf Club did not track the bag payments that were earned by each caddie.

176.     Upon information and belief, Hudson National Golf Club did not take a tax deduction from bag payments.

177.     The full amount of the bag payment that the golfer paid was typically paid to the caddie without deductions or allowances for payroll taxes.

178.     Upon information and belief, Hudson National Golf Club did not treat bag payments paid by golfers to caddies as revenue or profit before caddies received bag payments.

179.    Upon information and belief, bag payments were not costs to the Hudson National Golf Club.

180.    Upon information and belief, Hudson National Golf Club did not deduct bag payments as payroll expenses.

181.    Caddies were not guaranteed to be paid just by showing up to work at Hudson National Golf Club. For instance, if golfers canceled the round, the caddie may not be paid.

182.    Caddies were not paid by Hudson National Golf Club, except when caddies worked on "outings," which included marketing groups, and special events.

183.    Bag fees constitute gratuities or tips rather than wages.

184.    Caddies were not paid minimum wage by Hudson National Golf Club.

185.    Caddies were not paid overtime wages at a rate of one and one half (1 and 1 ½) times the regular rate of pay.

186.    Even if bag payments were "wages," they would not constitute payment at the lawful overtime rate of one and one half (1 and 1 ½) times the regular rate of pay.

187.    Even if bag payments were "wages," they would not cover call-in pay obligations or time spent on unpaid work as shown herein.

188.    Caddies were not paid spread-of-hours.

189.    Caddies were not paid call-in pay.

**5.1.6.    <u>Unpaid Work Including Meetings, Cleaning, Required Time on Duty.</u>**

190.    Time spent on virtually any activity other than caddying was not covered by bag payments.

191.    At the start of each golf season, Plaintiff, David Anderson, and other caddies were required to attend a meeting at the Hudson National Golf Club for approximately thirty (30)

minutes to discuss issues such as rules and regulations, dress code, and work expectations. Time spent in the meeting was not compensated.

192.    In approximately the first Saturday each June, Plaintiff, David Anderson, and other caddies were required to attend a meeting for approximately thirty (30) minutes at Hudson National Golf Club. Time spent in the meeting was not compensated.

193.    Approximately one week before the start of each golf season, Plaintiff, David Anderson, and other caddies were required to retrieve uniforms and check in with the caddie master at the Hudson National Golf Club. The time spent retrieving the uniform and checking in with the caddie master was not compensated.

194.    Approximately one week before opening day, Plaintiff, David Anderson, and other caddies were required to clean the caddie shack to prepare it for the season, which took approximately two (2) hours. Time spent cleaning was not compensated.

195.    In one season, Plaintiff, David Anderson, and other caddies were required to clean trash from a hill near the caddie shack, which took approximately two (2) hours. The time spent cleaning was not compensated.

196.    At the end of each golf season, Plaintiff, David Anderson, and other caddies were required to clean and winterize the caddie shack took about three (3) hours. The time spent cleaning was not compensated.

197.    Before each "outing," Plaintiff, David Anderson, and other caddies were required to attend a thirty (30) minute meeting or "rally."

198.    In approximately the last Saturday each October, Plaintiff, David Anderson, and other caddies were required to attend a meeting for which they were not paid.

199.    Caddies were required, permitted, or encouraged to report to Hudson National Golf Club just in case a golfer showed up for a round and needed a caddie.

200.     Caddies were frequently told "you can't make money at home," which meant that caddies were required or permitted or encouraged to go to Hudson National Golf Club just in case a golfer showed up for a round.

201.     When Plaintiff, David Anderson, and other caddies reported for duty and golfers canceled or it rained or golfers did not play, then Plaintiffs other caddies were not paid even though they reported to work and frequently remained on site.

202.     Hudson National Golf Club recommended Plaintiff, David Anderson, and other caddies not leave the site when there were no golfers just in case a golfer arrived and required a caddie.

203.     Plaintiff, David Anderson, and other caddies were led to believe that if they left the site and a golfer arrived but there were no caddies available, the caddie(s) who left would not work again, i.e., be punished.

204.     Hudson National Golf Club required or permitted one or more caddies, including Plaintiff, David Anderson, to stay on duty until approximately one hour before dark in case a golfer came and wanted to play. Caddies were sometimes told "someone's got to stay, you guys figure it out" or one person stays until the next group comes in.

**5.2. Caddies Were Misclassified as Independent Contractors.**

205.     All references to "caddies" include but are not limited to Plaintiffs.

206.     As a matter of economic reality, the caddies at Hudson National Golf Club are employees.

207.     As a matter of economic reality, the caddies depend on Hudson National Golf Club for the opportunity to render services.

208.     As a matter of economic reality, the caddies at Hudson National Golf Club are not in business for themselves.

23

209.    The caddies are economically dependent on Hudson National Golf Club.

210.    The caddies are within the direct control of Hudson National Golf Club.

211.    Hudson National Golf Club exercises a great deal of control over the caddies' daily activities.

212.    As a matter of economic reality, caddies are employees of Hudson National Golf Club.

### 5.2.1.    <u>HIRE & FIRE - Hudson National Golf Club Had the Power to Hire and Fire Caddies.</u>

213.    Hudson National Golf Club had power to hire and fire caddies.

214.    Hudson National Golf Club advertised on its website that applicants for a caddie position must go through a website titled "employment opportunities."

215.    Hudson National Golf Club advertised on its website that applicants for a caddie position must go through the Hudson National Golf Club's Caddie Master.

216.    Caddies were told that they would be fired if they left early.

217.    Caddies were told that they could be replaced if they were unwilling to work.

218.    Defendant KEVIN MCCONAUGHY wrote on the caddies' work schedule that, "Please keep in mind that if I have caddies that are not willing to work they will easily be replaced with someone else, thank you."

219.    When a particular incident occurred, Defendant KEVIN MCCONAUGHY threatened caddies with termination by saying "There was an incident tonight that is unacceptable and I don't care for the reason either, if there is one more thing that happens like this there will be severe consequences. I am up here working all day to make sure the members and guests enjoy their visit, there are 100 things to deal with throughout the day, and never should 1 be involving pettiness in the yard. There are plenty of caddies that will give everything to be here and I don't care who you

are, if this ever happens again, you will be replaced, no questions asked. Come to work, be professional, do your job, it is literally that easy."

220.    Frequently, the Caddie Master required caddies to report the amount of money the golfer or guest paid to the Caddie. Then the Caddie Master could direct the caddie to return excess money to the member or guest if the Caddie Master determined the caddie was "overpaid."

221.    Hudson National Gold Club paid caddies approximately $125 per bag when the caddie was assigned to work for certain groups, such as marketing groups and golf digest raters. In those instances, caddies were required to tell the Caddie Master how much the golfers tipped the caddies. Then, Hudson National Gold Club would then reduce the amount it paid to the caddie by using the gratuities as an offset.

### 5.2.2.    <u>SUPERVISION – Hudson National Golf Club Supervised Caddies' Work.</u>

222.    Caddies were supervised by the Hudson National Golf Club and Defendants.

223.    Caddies were instructed to avoid certain infractions.

224.    Caddies were threatened with punishments for perceived infractions.

225.    Defendant KEVIN MCCONAUGHY wrote to the caddies: "I am tired of seeing some of you take out rain jackets and other items in golf bags and then forgetting about them and leaving them in the starter shack. If someone's bag is too heavy you politely ask them if they can take something out they don't need, you don't tell them the bag is too heavy empty it. The next caddie who forgets a shoe bag will not be happy with how I handle it, It turns into a month long adventure to find out who it belongs to and how to get it back to them."

226.    In another instance, Defendant KEVIN MECCONAUGHY wrote to the caddies: "Gentlemen, We all need to be aware that when you are out caddying that you can be seen by a lot of people outside of your own group. Please do not ever move golf balls or improve the lie of your players, let the members and guests golf their ball! Thank you."

227.    Caddies were directed to clean and count golf clubs correctly.

228.    Caddies were reprimanded and threatened with punishment for putting clubs in the wrong bag.

229.    Caddies were threatened that they would be fined with paying for the cost of car services to send clubs back to golfers, removal from the work schedules, and withheld payments.

230.    For example, Defendant KEVIN MCCONAUGHY told the caddies, "Guys everyday it seems like someone puts the wrong club in the wrong bag after the round. Clean one set of clubs at a time and pay attention!!!! It makes our whole operation look awful. I am not going to be taking this so easily after today and you guys will be paying for car services to get the clubs to where they need to be."

231.    Defendant KEVIN MCCONAUGHY told the caddies: "You will not be getting paid until you clean and count the clubs in your bag and confirm with the player they are all there and in the correct bag! To go along with that they must be placed behind the correct car, even if it is in the top parking lot. I never want to see golf bags in the circle or by the bag drop unless they are getting picked up in a car service. Quit being lazy!!!!!!!!!!!!!!!!!!!"

232.    When a caddie's wallet was reported stolen, Defendant KEVIN MCCONAUGHY, told the caddies: "Someone had the audacity to steal Landale's wallet right out of his locker yesterday. If it is not returned by tomorrow then we are going to have a serious issue. If I cannot trust you to not steal from each other the caddie shack will be no more and you can all sit outside while you wait. This problem has to be fixed immediately."

### 5.2.3.  <u>WORK SCHEDULES - Hudson National Golf Club Controlled Caddies' Work Schedules.</u>

233.    Hudson National Golf Club established work schedules that the caddies were required to obey.

234.    Caddies did not set their own schedules.

235.    Caddies work schedules were controlled by Hudson National Golf Club.

236.    Caddies work schedules designated the date and time to begin work.

237.    Caddie work schedules designated the name of the caddie and arrival time.

238.    Caddies were frequently required to remain on duty while waiting for golfers' tee time. For example, a caddie could be scheduled to arrive at 1:00 PM and the tee time may not be until an hour or more later. During that time, the caddie was required to remain on duty, without compensation.

239.    Tee time was frequently more than an hour and a half after the caddies scheduled work arrival time.

240.    If a golf round was rescheduled, the Caddie Master would reschedule the caddie without warning and require the caddie to remain on duty until the rescheduled round. The caddie was not paid for the on-duty time.

241.    Defendant RICHARD HARDIN issued written schedules to caddies that included the date of work, time of arrival, and the designated caddie who should report to work at that date and time.

242.    Defendant KEVEN MCCONAUGHY issued written schedules to caddies that included the date of work, time of arrival, and the designated caddie who should report to work at that date and time.

243.    In addition to schedules, caddies were also scheduled to work various events and tournaments at Hudson National Golf Club.

244.    Caddies were repeatedly directed to be "on time or early" for work.

245.    Defendant KEVIN MCCONAUGHY told caddies "EVERYONE BE HERE ON TIME OR EARLY READY TO GO!"

246.    Defendant RICHARD HARDIN directed caddies to "be on time or early."

27

247.    Caddies were reprimanded for lateness.

248.    Defendant RICHARD HARDIN told caddies that "The reason we send out emails with a time is so you can be here for that time, some of you feel that it is not important to be prompt. We can't stress enough to be here on time and ready for work."

249.    Defendant KEVIN MCCONAUGHY threatened caddies, on a work schedule, that "No more excuses anyone late isn't working and I want everyone to be early tomorrow."

250.    Frequently, caddies were prohibited from leaving "early."

251.    Defendant KEVIN MCCONAUGHY told caddies "I am sick and tired of guys leaving early, go work at Hudson Hills if you want to do that I am done with it. This is our busy season so either hang out and wait or go find somewhere else to work." And another time he reprimanded caddies, "Slow weekend is over, no more leaving early busy day tomorrow."

252.    Hudson National Golf Club controlled when caddies could take days off.

253.    Caddies were required to request days off.

254.    Caddies were told "Small Outing, if you want or need the day off please let me know asap."

255.    Hudson National Golf Club monitored the times that caddies arrived to, and left from, work.

256.    Defendant KEVIN MCCONAUGHY threatened caddies "I will be standing at the shack looking at the clock, do not be late tomorrow!!!!!!!!!!!!"

257.    Defendant KEVIN MCCONAUGHY also directed caddies that "Everyone needs to walk up and sign in themselves so I can tell you your time."

258.    Caddies were required to attend meetings by Hudson National Golf Club to go over rules and instructions.

259.    When golfers canceled or change rounds, then Hudson National Golf Club changed caddies' work schedules.

260.    When golfers canceled or changed their rounds, the caddies were required to stay on site in case other golfers to came, even though caddies were not paid for the on-duty time.

261.    During the COVID19 pandemic shutdown in 2020, caddies were told not to come into work if they were feeling sick.

262.    Caddies did not work at their own convenience at Hudson National Golf Club.

### 5.2.4.    **TERMS & CONDITIONS - Hudson National Golf Club Supervised and Controlled Caddies' Conditions of Employment.**

263.    Hudson National Golf Club assigned caddies to work with specific golfers.

264.    Caddies were not free to reject work with assigned golfers.

265.    Caddies were told not to approach golfers about caddying for them.

266.    If a caddie refused to work with an assigned golfer, the caddie would be punished in one or more ways, such as by removing the caddie from the schedule or assigning the caddie lower paying or undesirable golfers and groups.

267.    Hudson National Golf Club controlled the terms and conditions of caddies' work.

268.    Defendant KEVIN MCCONAUGHY directed caddies that "If you want to Caddie at Hudson National you have to 1. Show up on time and 2. Be a professional Caddie. These are 2 very basic rules that some people have not been following and I am ready to start making some changes to solve that."

269.    Caddies were instructed on how to do their work.

270.    Caddies were reprimanded for perceived wrongdoing.

271.    Defendant KEVIN MCCONAUGHY told caddies, "As a walking only golf course with mandatory caddies we have no excuse to ever have bunkers that are not raked. Please do not let

the players rake the bunkers as they have no clue what they are doing, anytime a player hits in a bunker make sure you leave it as perfect as you found it"

272.    Defendant KEVIN MCCONAUGHY told caddies, "I just spoke with Brett and he would like to make sure we are doing a better job of placing the bunker rakes in the correct areas after use. We can't have them laying in the fescue or laying any other way than parallel to the hole."

273.    Caddies were required to work beyond the scope of assisting assigned golfer(s).

274.    Defendant KEVIN MCCONAUGHY told caddies, "Make a special effort to repair ball marks even if they are not part of your groups doing."

275.    Caddies were directed to do work beyond caddying.

276.    Caddies were directed to move golf carts and clean trash out of golf carts and the caddie shack.

277.    Caddies were told to "go above and beyond for members."

278.    Caddies were directed to enforce rules set by Hudson National Golf Club.

279.    Defendant KEVIN MCCONAUGHY told caddies that "If anyone is seeing members or guests smoking and then throwing their cigarettes on the course please let me know tomorrow."

280.    Caddies were required to enforce the pace of play using equipment provided by Hudson National Golf Club.

281.    Defendant KEVIN MCCONAUGHY told caddies "Another point to mention is that we will be using Tagmarshall gps tracking devices to monitor pace of play that we will ask 1 caddie per group to carry"

282.    Defendant KEVIN MCCONAUGHY told caddies "I am going to make a big emphasis on pace of play for the remainder of the season as groups seem to be slowing down rather than speeding up without the fescue. You can let your groups know if you see stretch out there he is

watching you because you are slow, he will be more aggressive with slow groups and we are going to do our best to have everyone play in under 4:15 the rest of the year."

283.    Caddies were required to park in designated areas.

284.    Caddies were prohibited from using their phones except for medical emergencies.

285.    Caddies were directed to treat members' children just like members.

286.    Caddies were punished by assignment to undesirable golfers or rounds or removal from the work schedule.

287.    Caddies were repeatedly reminded to behave according to Hudson National Golf Club rules and regulations.

288.    Caddies were told of professionalism requirements.

289.    Caddies were told to "work hard."

290.    Caddies were told to "do our best job to make it a seamless operation and work together."

291.    Caddies were told to make events and operations as "seamless" as possible,

292.    Caddies were told to "have some pride working for" Hudson National Golf Club.

293.    During the 2020 COVID19 pandemic shutdown, Hudson National Golf Club controlled how caddies worked.

294.    During part of the COVID19 pandemic, caddies were directed to avoid touching the golf clubs, that golfers would carry their own bags, but caddies would still be responsible for spotting balls, fixing ball marks and divots, reading greens and would work on schedule.

295.    Caddies were required to wear uniforms.

296.    Uniforms took the form of one-piece jumpsuits with Hudson National Golf Club logos on front and back.

297.    The caddies' names were put on the one-piece jumpsuit uniform.

298. Caddies were directed to pick up uniforms at the start of the season.

299. Caddies were told, "This is our time to shine, important to be dressed in clean uniform, hat and groomed."

300. At times, caddies were required to wear bibs.

301. Caddies were also required to obey a dress code.

302. Caddies were told "Whoever is working today wear a red or white golf shirt and khaki pants or shorts, that is what you will be caddying in today."

303. Caddies were also directed to wear "white shoes only at all times, even second loops" and "white undershirts only" and "Hudson National White hats only."

304. Caddies were told to avoid "sketchy beards or facial hair."

### 5.2.5. CONTROL OVER PAY RATES – Hudson National Golf Club Determined the Rate and Method of Payment to Caddies.

305. Hudson National Golf Club exercised control over caddies' compensation rates.

306. Ordinarily, the golfer(s) or guests to whom the caddies were assigned were the sole source of income for the caddies.

307. Hudson National Golf Club did not pay caddies for their work except when caddies worked for marketing groups, prospective members, outings, golf digest groups, and rounds by friends of certain club managers and professional staff (Caddie Master, assistant Caddie Master, Head Pro, Director of Golf).

308. Caddies were discouraged from discussing their rates with golfers and their guests.

309. Caddies were discouraged from discussing their compensation with golfers, even though golfers and guests were often the only source of income for caddies.

310. Hudson National Golf Club suggested caddie compensation rates of $125 Per Bag for 18 Holes and $65 Per Bag for 9 holes.

311.    Even though Hudson National Golf Club outwardly "suggested," a bag rate, Defendant KEVIN MCCONAUGHY told caddies "Please remember that the bag rate is $125 and how lucky we all are to even be working this season given the circumstances. I do not want to hear anyone complain about making the suggested bag rate or else they can go work somewhere else where the rate is $75-$100 per bag, no more complaining!!!"

312.    At times, when caddies were paid additional sums by certain guests, the caddie master would ask the caddie how much was paid and require the caddie to return the money for the benefit of the member or the member's guest.

### 5.2.6.   RECORDS - Hudson National Golf Club was Responsible for Maintaining Employment Records.

313.    Defendants maintained work schedules that were sent to caddies.

314.    Upon information and belief, Hudson National Golf Club has receipts for payments from golfers to caddies, i.e., "chits."

315.    On top of some work schedules, caddies were ordered to sign "independent contractor forms."

316.    Defendant KEVIN MCCONAUGHY directed caddies, "If you didn't sign the independent contractor form today please sign one tomorrow."

317.    The use of the terms "independent contractor," does not transform them into magic words imbued with legally controlling significance.

318.    Defendants willfully misclassified caddies by ordering caddies to sign "independent contractor" forms while simultaneously controlling the hiring, firing, supervision, scheduling, and compensation of caddies.

### 5.2.7.   PREMISES & EQUIPMENT – Caddies Worked Almost Exclusively on Hudson National Golf Club's Premises.

319.    Caddies primarily worked on Hudson National Golf Club's golf course and grounds.

320.    Hudson National Golf Club owned and controlled the caddie shack, where caddies assembled for work.

321.    Caddies used Hudson National Golf Club's equipment.

322.    Caddies used golf carts that were owned and controlled by Hudson National Golf Club.

323.    Caddies used the Club's rakes on the golf course.

324.    Caddies were required to always carry certain equipment that included towels, a laser, and sand bottle. Hudson National Golf Club provided GPS devices for caddies to monitor and enforce the pace of play rules on golfers. During the COVID19 pandemic shutdown, caddies were given hand sanitizer from the Caddie Master.

325.    Caddies were banned from entering the golf shop unless making a purchase.

326.    Caddies regularly served alcoholic beverages and food to golfers from Hudson National Golf Club.

327.    For instance, in approximately five to seven rounds per week, Plaintiff, David Anderson, served food and/or alcoholic beverages to golfers.

328.    Upon information and belief, all alcohol that golfers drank on the course came from Hudson National Golf Club.

### 5.2.8.    <u>NO INDEPENDENT CADDIE BUSINESSES – Caddies Lacked a Business that Shifted from one Joint Employer to Another.</u>

329.    Caddies were not required to set up independent business entities such as corporations or LLCs.

330.    Caddies did not work for independent or outside business entities.

331.    Caddies were not required to make large up-front investments to caddie at Hudson National Golf Club.

332.    Caddies did not bear significant risk of loss by working at Hudson National Golf Club.

333.    Caddying at Hudson National Golf Club did not require substantial independent business initiative.

334.    Caddying at Hudson National Golf Club did not require business management skills.

### 5.2.9.    INTEGRAL LINE JOB – Caddies Performed a Discrete Line Job that was Integral to Hudson National Golf Club's Business as a Golf Course.

335.    Caddies are integral to Hudson National Golf Club.

336.    Hudson National Golf Club is primarily a golf course.

337.    Hudson National Golf Club prominently features pictures of its golf course on its website.

338.    Hudson National Golf Club advertises that the course was designed by Tom Fazio, a half-of-fame golf course architect.

339.    Hudson National Golf Club is a walking golf course.

340.    Hudson National Golf Club requires golfers to use caddies on the course.

341.    Golfers are generally prohibited from golfing at Hudson National Golf Club without a caddie.

342.    Hudson National Golf Club prohibits use of the golf course for non-golf purposes such as running, jogging, or walking.

343.    Hudson National Gold Club requires golfers to arrange for use of specific caddies through the Hudson National Golf Club.

344.    Upon information and belief, Hudson National Golf Club generally prohibits golfers from bringing their own caddies.

**5.2.10. <u>EXCLUSIVE EMPLOYMENT – Caddies Worked Virtually Exclusively for Hudson National Golf Club</u>**

345.    Hudson National Golf Club held a "staff day" which included caddies.

346.    Caddies were referred to as having a "job" and working at Hudson National Golf Club.

347.    In an email with the subject line "DO YOUR JOB" Defendant KEVIN MCCONAUGHY reprimanded caddies for not cleaning out golf carts.

348.    Defendant KEVIN MCCONAUGHY told caddies, "Gentlemen, I played a couple holes today and I was not very happy with the amount of ball marks I saw on the greens. Considering we are doing 2 caddies per foursome again and you are all riding in the carts I expect this to never be an issue again and I will be sure to keep a close eye on anyone not doing their job."

349.    Caddies were told, "This should be another great season at Hudson and it is all of our jobs to make that happen for the members and each other. If anyone has any questions please let me know."

350.    Caddies were told, "Come to work, be professional, do your job, it is literally that easy."

351.    Caddies were virtually prohibited from working outside of the Hudson National Golf Club during the golf season.

352.    To enforce a prohibition on outside employment, caddies were prohibited from taking days off.

353.    Defendant KEVIN MCCONAUGHY told caddies "Busy season is here, no more days off and be on time!"

354.    Defendant KEVIN MCCONAUGHY told caddies "We are open and will have member play during the Met AM, August 1-4 so no days off."

36

355.    Defendant RICHARD HARDIN told caddies "Guys, as of now Wednesday looks VERY slow. Since the season has been so busy, if you would like the day off please REQUEST, and it's only a request, the day off. I will let you know as soon as I can if your request is approved."

356.    Short of termination, caddies could also be removed from the schedule or assigned undesirable golf rounds.

### 5.3.  Caddies' Work Hours, Bag Fees, and Costs Incurred.[1]

357.    At Hudson National Golf Club, the work period for caddies is from approximately April 10 to approximately November 20, i.e., approximately seven months per year.

358.    Upon information and belief, COVID19 interfered with the usual work schedule of caddies in the golf season from approximately April 10, 2020, to approximately May 22, 2020, and then resumed.

#### 5.3.1.  Plaintiff David Anderson

359.    Each April, Plaintiff, David Anderson, worked the following approximate weekly hours: two days per week from 8:00 AM to 5:00 PM, one day per week from 9:00 AM to 5:00 PM, one day per week from 8:00 AM to 7:30 PM, two days per week from 6:45 AM to 6:45 PM.

360.    Each April, Plaintiff, David Anderson, received approximately $285 per day in bag payments.

361.    Each May, Plaintiff, David Anderson, worked the following approximate weekly hours: three days per week from 7:30 AM to 6:30 PM, one day per week from 7:30 AM to 8:00 PM, one day per week from 6:45 AM to 8:00 PM and one day per week from 6:45 Am to 6:45 PM.

362.    Each May, Plaintiff, David Anderson, received approximately $350 per day in bag payments.

---

[1] All employment periods for each Plaintiff are for the longer of either the employment period listed Section 4.1 or the statutory period of six years and 228 days preceding the filing of the original complaint, unless otherwise stated.

363.    Each June, Plaintiff, David Anderson, worked the following approximate weekly hours: two days per week from 7:00 AM to 6:30 PM, one day from 9:00 AM to 6:30 PM, one day from 7:00 AM to 8:25 PM, one day from 6:45 AM to 8:25 PM, and one day from 6:45 AM to 7:00 PM.

364.    Each June, Plaintiff, David Anderson, received approximately $480 per day in bag payments.

365.    Each July, Plaintiff, David Anderson, worked the following approximate weekly hours: two days per week from 7:00 Am to 7:00 PM, one day per week from 9:00 AM to 7:00 PM, one day per week from 7:00 AM to 8:25 PM, one day per week from 6:45 AM to 8:25 PM, and one day per week from 6:45 AM to 7:00 PM.

366.    Each July, Plaintiff, David Anderson, received approximately $460 per day in bag payments.

367.    Each August, Plaintiff, David Anderson, worked the following approximate weekly hours: two days from 7:00 AM to 6:30 PM, one day from 9:00 AM to 6:30 PM, one day from 7:00 AM to 7:50 PM, one day from 6:45 AM to 7:50 PM, and one day from 6:45 AM to 7:00 PM.

368.    Each August, Plaintiff, David Anderson, received approximately $395 per day in bag payments.

369.    Each September, David Anderson, worked the following approximate weekly hours: one day per week from 7:30 AM to 6:00 PM, one day from 7:30 AM to 7:00 PM, one day from 9:00 Am to 6:00 PM, one day from 7:30 AM to 7:00 PM, one day from 6:45 AM to 7:00 PM, and one day from 6:45 AM to 6:00 PM.

370.    Each September, Plaintiff, David Anderson, received approximately $475 per day in bag payments.

371.     Each October, Plaintiff, David Anderson, worked the following approximate weekly hours: one day from 7:30 AM to 5:30 PM, two days from 9:00 AM to 5:30 PM, one day from 7:30 AM to 6:15 PM, one day from 7:00 AM to 6:15 PM and one day from 7:00 AM to 5:30 PM.

372.     Each October, Plaintiff, David Anderson, received approximately $455 per day in bag payments.

373.     Each November, Plaintiff, David Anderson, worked the following approximate weekly hours: one day from 8:30 AM to 4:30 PM, three days from 9:00 AM to 4:00 PM, and two days from 8:00 AM to 4:00 PM.

374.     Each November, Plaintiff, David Anderson, received approximately $255 per day in bag payments.

375.     In addition to the weekly hours, Plaintiff, David Anderson, worked additional shifts for "outings," each of which lasted approximately 7.5 hours.

376.     Plaintiff, David Anderson, worked approximately one outing each month each April and November, three outings each month each May, August, and October, and four outing each month each June, July, and September and was paid approximately $160 per outing.

377.     Plaintiff, David Anderson, was requested or permitted to report for duty but was not paid approximately three times each April, approximately five times each month in May, June, July, August, and September, approximately two times each October and approximately three times each November.

378.     Plaintiff, David Anderson, was required to drive members' golf clubs to the City of New York, catch stray cats at the clubhouse, chauffeur members various places such as the train station, clean and take trash out of the caddie shack, winterize the caddie shack, install a PA system at the caddie shack, remove a TV from storage, hook up a TV, and collect money to purchase supplies for the caddie shack, among other tasks.

379.    To maintain the pace of work required at Hudson National Golf Club, Plaintiff, David Anderson, was required to purchase additional uniforms.

380.    To accommodate the work schedule, Plaintiff, David Anderson, bought approximately three extra uniforms per season.

381.    Additional uniforms cost approximately $90 each.

382.    Plaintiff, David Anderson, was required to pay laundering costs to launder uniforms.

383.    Plaintiff, David Anderson, was required to purchase approximately 11 pairs of golf shoes per season, each of which cost approximately $100.

### 5.3.2.  **Plaintiff Michael Nigro**

384.    Each April, Plaintiff, Michael Nigro, worked the following approximate weekly hours: three days per week from 7:00 AM to 1:00 PM, two days per week from 11:00 AM to 5:00 PM and one day per week from 7:00 AM to 5:00 PM.

385.    Each April, Plaintiff, Michael Nigro, received approximately $200 per day in bag payments.

386.    Each May and June, Plaintiff, Michael Nigro worked the following approximate weekly hours: three days from 7:00 AM to 1:00 PM, three days from 11:00 AM to 5:00 PM.

387.    Each May, Plaintiff, Michael Nigro, received approximately $275 per day in bag payments.

388.    Each July, August, and September, Plaintiff Michael Nigro worked the following approximate weekly hours: two days per week from 7:00 AM to 1:00 PM, two days per week from 11:00 AM to 5:00 PM, one day per week from 11:00 AM to 6:00 PM and one day per week from 7:00 AM to 5:00 PM.

389.    Each June, July and August, Plaintiff, Michael Nigro, received approximately $300 per day in bag payments.

390.    Each September, Plaintiff, Michael Nigro, received approximately $250 per day in bag payments.

391.    Each October, Plaintiff, Michael Nigro, worked the following approximate weekly hours: three days per week from 7:00 AM to 1:00 PM, three days per week from 11:00 AM to 5:00 PM.

392.    Each October, Plaintiff, Michael Nigro, received approximately $190 per day in bag payments.

393.    Each November, Plaintiff, Michael Nigro, worked the following approximate weekly hours: three days per week from 7:00 AM to 4:00 PM, three days per week from 7:00 AM to 3:00 PM.

394.    Each November, Plaintiff, Michael Nigro, received approximately $135 per day in bag payments.

395.    Plaintiff, Michael Nigro was requested or permitted to report for duty but was not paid approximately once each month.

396.    In addition to the weekly hours, Plaintiff, Michael Nigro, worked additional shifts for "outings," each of which lasted approximately 6 hours.

397.    Each April, May, and June, July, August, September, and October, Plaintiff, Michael Nigro, worked approximately one outing per month.

398.    Plaintiff, Michael Nigro, was paid approximately $125 per outing from the Hudson National Golf Club.

399.    Plaintiff, Michael Nigro, was required to purchase tools of the trade as follows: $500 for a laser range finder per season, two pairs of golf shoes per season which each cost approximately $50, and approximately two towels per season, each of which costs approximately $15.

### 5.3.3. **Plaintiff Troy Moore**

400.     Each April, Plaintiff, Troy Moore, worked the following approximate weekly hours: two days per week from 7:00 AM to 5:00 PM, one day from 7:00 AM to 5:00 PM, one day from 9:00 AM to 5:00 PM, and two days from 7:00 AM to 5:30 PM.

401.     Each April, Plaintiff, Troy Moore, received approximately $125 per day in bag payments.

402.     Each May, Plaintiff, Troy Moore, worked the following approximate weekly hours: three days per week from 7:00 Am to 8:00 PM, three days from 7:00 AM to 7:00 PM.

403.     Each May, Plaintiff, Troy Moore, received approximately $200 per day in bag payments.

404.     Each June, July, and August, Plaintiff, Troy Moore, worked the following approximate weekly hours: three days per week from 7:00 AM to 6:30 PM, three days per week from 7:00 AM to 6:00 PM.

405.     Each June, July, and August, Plaintiff, Troy Moore, received approximately $375 per day in bag payments.

406.     Each September, Plaintiff, Troy Moore, worked the following approximate weekly hours: three days per week from 7:00 AM to 6:30 PM, three days per week from 7:00 AM to 6:00 PM.

407.     Each September, Plaintiff, Troy Moore, received approximately $275 per day in bag payments.

408.     Each October, Plaintiff, Troy Moore, worked the following approximate weekly hours: three days per week from 7:00 AM to 5:30 PM, three days per week from 7:00 AM to 5:00 PM.

409.    Each October, Plaintiff, Troy Moore, received approximately $175 per day in bag payments.

410.    Plaintiff, Troy Moore was requested or permitted to report for duty but was not paid approximately 3 times each month each April, June, July, August, September and October and approximately 5 times each May.

411.    In addition to the weekly hours, Plaintiff, Troy Moore, worked additional shifts for "outings" approximately three times per month each April, May, June, July, August, September, and October and was paid approximately $160 per outing.

412.    Plaintiff, Troy Moore, paid approximately $250 for a range finder, approximately three pairs of golf shoes per season, each of which cost approximately $180.

### 5.3.4.  **Plaintiff Joseph McGovern**

413.    Each April, Plaintiff, Joseph McGovern, worked the following approximate weekly hours: four days per week from 8:00 AM to 6:00 PM, two days per week from 8:00 AM to 5:00 PM.

414.    Each April, Plaintiff, Joseph McGovern, received approximately $300 per day in bag payments.

415.    Each May, Plaintiff, Joseph McGovern, worked the following approximate weekly hours: six days per week from 7:30 AM to 6:00 PM.

416.    Each May, Plaintiff, Joseph McGovern, was paid approximately $250 per day in bag payments.

417.    Each June, July, August, and September, Plaintiff, Joseph McGovern, worked the following approximate weekly hours: two days per week from 7:00 AM to 6:00 PM, two days per week from 7:00 AM to 7:00 PM, two days per week from 7:00 AM to 8:00 PM.

418.    Each June, July, August, and September, Plaintiff, Joseph McGovern, received approximately $275 per day in bag payments.

419.    Each October, Plaintiff, Joseph McGovern, worked the following approximate weekly hours: six days per week from 7:00 AM to 5:00 PM.

420.    Each October, Plaintiff, Joseph McGovern, received approximately $225 per day in bag payments.

421.    Each November, Plaintiff, Joseph McGovern, worked the following approximate weekly hours: six days per week from 8:00 AM to 4:30 PM.

422.    Each November, Plaintiff, Joseph McGovern, received approximately $200 per day in bag payments.

423.    Plaintiff, Joseph McGovern, worked approximately one outing each month each May, June, July, August, and September.

424.    Plaintiff, Joseph McGovern, received approximately $300 per outing.

425.    Plaintiff, Joseph McGovern, purchased the following tools of the trade: approximately $820 per season on approximately 7 pairs of shoes per season and approximately $400 per year on a range scanner.

426.    Plaintiff, Joseph McGovern, reported for duty at work but was not paid approximately five times each month each April, June, July, August, and September, and approximately four times each November.

### 5.3.5.  **Plaintiff Ross Johnson**

427.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie, Plaintiff, Ross Johnson worked the following approximate weekly hours each April: five days per week from 6:00 AM to 4:00 PM, one day per week from 6:00 AM to 5:00 PM.

428.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie each April, Plaintiff, Ross Johnson received approximately $230 per day in bag payments.

429.    Approximately four days each April, from the start of the statutory period to 2017, Plaintiff, Ross Johnson, reported for duty as a caddie but was not paid for the appearance or shift.

430.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie, Plaintiff, Ross Johnson worked the following approximate weekly hours each May, June, July, and August: four days per week from 6:00 AM to 7:00 PM, two days per week from 6:00 AM to 6:00 PM.

431.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie each May and June, Plaintiff, Ross Johnson received approximately $300 per day in bag payments.

432.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie each July and August, Plaintiff, Ross Johnson received approximately $450 per day in bag payments.

433.    Approximately three days each month in each May, June, July, and August, from the start of the statutory period to 2017, Plaintiff, Ross Johnson, reported for duty as a caddie but was not paid for the appearance or shift.

434.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie, Plaintiff, Ross Johnson worked the following approximate weekly hours each September: four days per week from 6:00 AM to 6:00 PM, two days per week from 6:00 AM to 7:00 PM.

435.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie each September, Plaintiff, Ross Johnson received approximately $330 per day in bag payments.

436.    Approximately one day each September, from the start of the statutory period to 2017, Plaintiff, Ross Johnson, reported for duty as a caddie but was not paid for the appearance or shift.

437.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie, Plaintiff, Ross Johnson worked the following approximate weekly hours each October and November: five days per week from 6:00 AM to 4:00 PM and one day per week from 6:00 AM to 5:00 PM.

438.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie each October, Plaintiff, Ross Johnson received approximately $330 per day in bag payments.

439.    Approximately one day each October, from the start of the statutory period to 2017, Plaintiff, Ross Johnson, reported for duty as a caddie but was not paid for the appearance or shift.

440.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie each November, Plaintiff, Ross Johnson received approximately $175 per day in bag payments.

441.    Approximately three days each November, from the start of the statutory period to 2017, Plaintiff, Ross Johnson, reported for duty as a caddie but was not paid for the appearance or shift.

442.    From the start of the statutory period to 2017, when Plaintiff, Ross Johnson, worked as a caddie, Plaintiff, Ross Johnson worked approximately one outing each April, approximately three outings each May, approximately four outings each month in June, July, August, and September, approximately three outings each October, and approximately one outing in November.

443.    Plaintiff Ross Johnson was paid approximately $175 per outing as a caddie.

444.     In 2018 and 2020, while working in outside services, Plaintiff, Ross Johnson, worked the following approximate weekly hours: five days per week from 6:00 AM to 4:00 PM, one day per week from 6:00 AM to 5:00 PM.

445.     In April 2019, Plaintiff, Ross Johnson, worked the following approximate weekly hours in outside services: five days from 6:00 AM to 6:PM and one day from 6:00 AM to 5:00 PM, but approximately three days per week, for approximately 3.5 hours per shift within the aforesaid schedule, Plaintiff, Ross Johnson, worked as a caddie.

446.     Each May, June, July, and August of 2018 and 2020, Plaintiff, Ross Johnson, worked the following approximate weekly hours in outside services: six days per week from 6:00 AM to 7:00 PM.

447.     Each September of 2018 and 2020, Plaintiff, Ross Johnson, worked the following approximate weekly hours in outside services: four days per week from 6:00 AM to 6:00 PM, two days per week from 6:00 AM to 7:00 PM.

448.     In August 2019, Plaintiff, Ross Johnson, worked the following approximate weekly hours in outside services: six days per week from 6:00 AM to 6:00 PM.

449.     Each October and November of 2018 and 2020, Plaintiff, Ross Johnson, worked the following approximate weekly hours in outside services: five days per week from 6:00 AM to 4:00 PM and one day per week from 6:00 AM to 5:00 PM.

450.     While working in outside services, Plaintiff, Ross Johnson, worked approximately one outing each April, three outings each month in May, June, July, August, September, and October, and approximately one outing each November. For each outing, Plaintiff, Ross Johnson, worked in outside services approximately seven (7) hours.

451.     In 2018, while working in outside services, Plaintiff, Ross Johnson, was paid $18 per hour by Hudson National Golf Club.

452.    In 2019, while working in outside services, Plaintiff, Ross Johnson, was paid approximately $19 per hour by Hudson National Golf Club.

453.    In 2020, while working in outside services, Plaintiff, Ross Johnson, was paid approximately $21 per hour by Hudson National Golf Club.

454.    Plaintiff Ross Johnson received time and one-half of the regular rate of pay for hours worked over 40 in a workweek while working in outside services for Hudson National Golf Club.

455.    While working in outside services, Plaintiff, Ross Johnson, was paid bi-weekly by Hudson National Golf Club.

456.    While working in outside services, Plaintiff, Ross Johnson, was paid by Hudson National Golf Club more than seven calendar days after the end of the week in which the wages were earned.

### 5.3.6.    **Plaintiff Siya Duma**

457.    Each April, Plaintiff, Siya Duma, worked the following approximate weekly hours: three days per week from 8:00 AM to 5:00 PM and two days per week from 8:00 AM to 6:00 PM.

458.    Each April, Plaintiff, Siya Duma, received approximately $200 per day in bag payments.

459.    Each May, Plaintiff, Siya Duma, worked the following approximate weekly hours: three days per week from 8:00 AM to 7:00 PM, one day per week from 7:00 AM to 6:00 PM, and two days per week from 8:00 AM to 5:00 PM.

460.    Each May, Plaintiff, Siya Duma, received approximately $200 per day in bag payments.

461.    Each June, Plaintiff, Siya Duma, worked the following approximate weekly hours: one day per week from 7:00 AM to 6:00 PM, three days per week from 7:00 AM to 7:00 PM, two days per week from 6:00 AM to 6:00 PM.

462.    Each June, Plaintiff, Siya Duma, received approximately $250 per day in bag payments.

463.    Each July, Plaintiff, Siya Duma, worked the following approximate weekly hours: three days per week from 7:00 AM to 8:00 PM, two days per week from 6:00 AM to 7:00 PM, and one day per week from 7:00 AM to 7:00 PM.

464.    Each July, Plaintiff, Siya Duma, received approximately $425 per day in bag payments.

465.    Each August, Plaintiff, Siya Duma, worked the following approximate weekly hours: three days per week from 7:00 AM to 8:00 PM, two days per week from 6:00 Am to 7:00 PM and one day per week from 7:00 AM to 7:00 PM.

466.    Each August, Plaintiff, Siya Duma, received approximately $290 per day in bag payments.

467.    Each September, Plaintiff, Siya Duma, worked the following approximate weekly hours: two days per week from 7:30 AM to 6:30 AM, two days per week from 6:30 AM to 6:30 PM, and two days per week from 7:30 AM to 7:30 PM.

468.    Each September, Plaintiff, Siya Duma, received approximately $200 per day in bag payments.

469.    Each October, Plaintiff, Siya Duma, worked the following approximate weekly hours: two days per week from 7:30 AM to 3:30 PM, three days per week from 7:30 AM to 4:30 PM, one day per week from 7:00 AM to 4:00 PM.

470.    Each October, Plaintiff, Siya Duma, received approximately $175 per day in bag payments.

471.    Each November, Plaintiff, Siya Duma, worked the following approximate weekly schedule: two days per week from 7:30 AM to 3:30 PM, three days per week from 7:30 AM to 4:30 PM, one day per week from 7:00 AM to 4:00 PM.

472.    Each November, Plaintiff, Siya Duma, received approximately $175 per day in bag payments.

473.    Plaintiff, Siya Duma, reported for duty but was not paid for the appearance or shift approximately two days each month in April, May, and October and all but approximately 10 days in November.

474.    Plaintiff, Siya Duma, worked approximately four outings per month in May, June, July, August, and September and received approximately $300 per outing.

475.    Plaintiff, Siya Duma, purchased the following tools of the trade: two range finders that each cost approximately $475 and approximately two pairs of shoes per season, each of which cost approximately $140.

### 5.3.7.    **Plaintiff Conrad Brewer**

476.    Each April, Plaintiff, Conrad Brewer, worked the following approximate weekly hours: three days per week from 7:00 AM to 6:00 PM and three days per week from 7:00 AM to 5:00 PM.

477.    Each April, Plaintiff, Conrad Brewer, received approximately $275 per day in bag payments.

478.    Each May, Plaintiff, Conrad Brewer, worked the following approximate weekly hours: two days per week from 7:00 AM to 5:00 PM, three days per week from 7:00 AM to 6:00 PM, one day per week from 9:00 AM to 6:00 PM.

479.    Each May, Plaintiff, Conrad Brewer, received approximately $275 per day in bag payments.

480.    Each June, Plaintiff, Conrad Brewer, worked the following approximate weekly hours: four days per week from 7:00 AM to 6:00 PM and two days per week from 7:00 Am to 5:00 PM.

481.    Each June, Plaintiff Conrad Brewer, received approximately $300 per day.

482.    Each July Plaintiff, Conrad Brewer, worked the following approximate weekly hours: four days per week from 7:00 AM to 5:00 PM and two days per week from 9:00 AM to 6:00 PM.

483.    Each July, Plaintiff, Conrad Brewer, received approximately $350 per day in bag payments.

484.    Each August, Plaintiff, Conrad Brewer, worked the following approximate weekly hours: three days per week from 7:00 AM to 7:00 PM, one day from 7:00 AM to 6:00 PM, and two days from 7:00 AM to 8:00 PM.

485.    Each August, Plaintiff, Conrad Brewer, received approximately $350 per day in bag payments.

486.    Each September, Plaintiff, Conrad Brewer, worked the following approximate weekly hours: four days per week from 7:00 AM to 5:00 PM, two days per week from 9:00 AM to 6:00 PM.

487.    Each September, Plaintiff, Conrad Brewer, received approximately $350 per day in bag payments.

488.    Each October, Plaintiff, Conrad Brewer, worked the following approximate weekly hours: five days per week from 7:00 AM to 5:00 PM and one day from 7:00 AM to 6:00 PM.

489.    Each October, Plaintiff, Conrad Brewer, received approximately $350 per day in bag payments.

490.    Each November, Plaintiff, Conrad Brewer, worked the following approximate weekly hours: one day from 8:00 AM to 4:00 PM, two days from 9:00 AM to 5:00 PM, three days from 8:00 AM to 5:00 PM.

491.    Each October and November, Plaintiff, Conrad Brewer, received approximately $275 per day in bag payments.

492.    Plaintiff, Conrad Brewer, purchased the following tools of the trade: range finder which cost approximately $250 and approximately 2 pairs of shoes per season which each cost approximately $75.

493.    Plaintiff, Conrad Brewer, worked approximately one outing each month and was paid approximately $300 per outing.

494.    Plaintiff, Conrad Brewer, reported for duty but was not paid for the appearance or shift approximately one day per week each month in April, May, June, October, and November.

## 6. <u>COLLECTIVE ACTION ALLEGATIONS</u>

495.    The claims in this Complaint arising out of the FLSA are brought by Plaintiffs on behalf of themselves and similarly situated individuals who worked as golf caddies at the Hudson National Golf Club since the date three years prior to the filing of this action and who elect to opt-in to this action (the "FLSA Collective").

496.    The FLSA Collective consists of golf caddies who have been victims of Defendants' common policies and practices that have violated their rights under the FLSA by, *inter alia*, willfully denying them minimum wage, overtime pay and other monies.

497.    As part of their regular business practice, Defendants intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to the Plaintiffs and the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

    a.   willfully failing to pay its employees, including Plaintiffs and the FLSA Collective, minimum wages for all hours worked

    b.   willfully failing to pay its employees, including Plaintiffs and the FLSA Collective, the appropriate premium overtime wages for all hours worked in excess of 40 hours in a workweek;

    c.   forcing employees to pay for required uniform cleaning costs; and,

    d.   willfully failing to record all the time that its employees, including Plaintiffs and the FLSA Collective, have worked for the benefit of Defendants.

498.    Defendants' unlawful conduct is pursuant to a corporate policy or practice of minimizing labor costs by misclassifying Plaintiffs and the FLSA Collective as independent contractors and failing to properly compensate Plaintiffs and the FLSA Collective for the hours they work.

499.    Defendants are aware or should have been aware that federal law required them to pay Plaintiffs and the FLSA Collective minimum wages for all the hours they worked.

500.    Defendants are aware or should have been aware that federal law required them to pay Plaintiffs and the FLSA Collective overtime premiums for hours worked in excess of 40 hours per week.

501.    The FLSA Collective would benefit from the issuance of a court supervised notice of this lawsuit and the opportunity to join it. This notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

502.    Upon information and belief, those similarly situated employees are known to Defendants, are readily identifiable, and can be located through Defendants' records.

503.    Defendants engaged in deceptive conduct—including but not limited to requiring caddies to sign an "independent contractor form"— to lead Plaintiffs and Collective and Class

Members to believe that they were independent contractors and not employees, which prevented

Plaintiffs and Collective and Class Members from discovering or asserting their claims any earlier

than they did.

**7. CLASS ACTION ALLEGATIONS**

504.    The claims in this Complaint arising out of the NYLL are brought by Plaintiffs

under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and classes

consisting of all persons who have worked as caddies at the Hudson National Golf Club and a class

of all employees who were not paid within 7 days of each workweek and who were manual workers

as defined in the NYLL. The class periods shall be for six years and 228 days (the "Rule 23 Class")

preceding the filing of the original complaint.

505.    The members of the Rule 23 Classes are so numerous that joinder of all members is

impracticable.

506.    Upon information and belief, the size of the Rule 23 Classes are at least forty (40),

and approximately 100 individuals.

507.    Although the precise number of such employees is unknown, the facts on which the

calculation of that number depends are presently within the control of Defendants.

508.    Defendants have acted or have refused to act on grounds generally applicable to the

Rule 23 Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief

with respect to the Rule 23 Class as a whole. For example, none of the Rule 23 class members are

paid minimum or overtime wages or spread of hours; nor are they given wage notices and

statements nor are they timely paid as required under NYLL Section 191.

509.    Common questions of law and fact exist as to the Rule 23 Class that predominate

over any questions only affecting them individually and include, but are not limited to, the following:

a.  Whether Defendants violated NYLL Articles 6 and 19, and the supporting New York State Department of Labor Regulations;

b.  Whether Defendants failed to pay Plaintiff and the Rule 23 Class minimum wages for all of the hours they worked;

c.  Whether Defendants correctly compensated Plaintiffs and the Rule 23 Class for hours worked in excess of 40 hours per workweek;

d.  Whether Defendants correctly compensated Plaintiffs and the Rule 23 Class for spread of hours for all shifts whose start and end times spread more than ten hours apart;

e.  Whether Defendants correctly compensated Plaintiffs and the Rule 23 Class for Call-in pay as required;

f.  Whether Defendants failed to keep true and accurate time and pay records for all hours worked by Plaintiffs and the Rule 23 Class, and other records required by the NYLL;

g.  Whether Defendants failed to furnish Plaintiffs and the Rule 23 Class with wage notices, as required by the NYLL;

h.  Whether Plaintiffs and the Rule 23 Class was required to pay for uniform cleaning costs;

i.  Whether Defendants failed to furnish the Plaintiffs and the Rule 23 Class with accurate statements of wages, hours worked, rates paid, and gross wages, as required by the NYLL;

j.  Whether Defendants failed to pay Plaintiffs on a weekly basis and not later than seven calendar days after the end of the week in which the wages were earned as required in NYLL Section 191;

k.   Whether Defendants' policy of failing to pay workers was instituted willfully or with reckless disregard of the law; and

l.   the nature and extent of class-wide injury and the measure of damages for those injuries.

510.   The claims of the Plaintiffs are typical of the claims of the Rule 23 Class. Plaintiffs and all of the Rule 23 Class members work, or have worked, as caddies at the Hudson National Golf Club or are paid more than seven days after the workweek. Plaintiffs and the Rule 23 Class members enjoy the same statutory rights under the NYLL, including to be properly compensated for all hours worked.

511.   Plaintiffs and the Rule 23 Class members have all sustained similar types of damages because of Defendants' failure to comply with the NYLL. Plaintiffs and the Rule 23 Class members have all been injured in that they have been uncompensated or under-compensated due to Defendants' common policies, practices, and patterns of conduct.

512.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Rule 23 Class.

513.   Plaintiffs retained counsel competent and experienced in wage and hour litigation, which has investigated potential claims, and has the resources to commit to representing the class.

514.   There is no conflict between the Plaintiffs and the Rule 23 Class members as they all served as caddies and/or were paid more than seven days after the workweek.

515.   A class action is superior to other available methods for the fair and efficient adjudication of this litigation. The members of the Rule 23 Class have been damaged and are entitled to recovery because of Defendants' violations of the NYLL, as well as their common and uniform policies, practices, and procedures. Although the relative damages suffered by individual Rule 23 Class members are not *de minimis*, such damages are small compared to the expense and burden

of individual prosecution of this litigation. The class members individually lack the financial resources to conduct a thorough examination of Defendants' timekeeping and compensation practices and to prosecute vigorously a lawsuit against Defendants to recover such damages. In addition, class litigation will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

516.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

**8.    Defendants The Hudson National Golf Club, Inc., (d/b/a "Hudson National Golf Club") and Theron C. Harvey Retaliated Against Plaintiff David Anderson due to his Participation in this lawsuit, Which Constitutes Protected Activity.**

517.    On or about February 20, 2024, Theron C. Harvey was served with process in the instant matter, *David Anderson et al. v. The Hudson National* et al, 7:23-cv-522 (KMK).

518.    On or about February 21, 2024, Richard Hardin was served with process in the instant matter, *David Anderson et al. v. The Hudson National* et al, 7:23-cv-522 (KMK).

519.    On or about February 21, 2023, THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") was served with process in the instant matter, *David Anderson et al. v. The Hudson National* et al, 7:23-cv-522 (KMK).

520.    On or about March 1, 2023, THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") filed a letter motion for an extension of time to answer the complaint in the instant matter, *David Anderson et al. v. The Hudson National* et al., (Case no. 7:23-cv-00522).

521.    On or about March 27, 2024, Kevin McConaughy was served with process in the instant matter, *David Anderson et al. v. The Hudson National* et al, 7:23-cv-522 (KMK).

522.    On or about June 30, 2023, THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club"), with the support of THERON C. HARVEY, filed a lawsuit

against, inter alia, David Anderson which included causes of action for (1) breach of contract (2) unjust enrichment (3) punitive damages and (4) attorneys' fees and costs (hereinafter "*Hudson National Golf Club Inc. v. David Anderson et al.* (Index no. 63195/2023)").

523.    The gravamen of *Hudson National Golf Club Inc. v. David Anderson et al.* (Index no. 63195/2023) is that David Anderson breached a purported contract for his living accommodations at the golf club by overstaying by one month and by causing Hudson nation to pay for repairs and by unjustly enriching himself to the detriment of Hudson National. As a result, Hudson National sought upwards of $60,000 plus attorney fees and punitive damages against David Anderson, claiming specifically "for Property Damage … an amount exceeding $30,000."

524.    In *Hudson National Golf Club Inc. v. David Anderson et al.* (Index no. 63195/2023), THERON C. HARVEY signed the verification annexed to the complaint, swearing to the truth of the following statement: "I am the Director of Club Operations for the plaintiff herein; I have read the foregoing Complaint and know the contents thereof, and the same is true to my own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true. This verification is made by me because the above party is a corporation, and I am The Director of Club Operations thereof. The grounds for my belief as to all matters not stated upon my own personal knowledge are as follows: papers, investigation and other materials contained in the corporation's file."

525.    On or about February 26, 2024, Justice Nancy Quinn Koba of the Supreme Court of the State of New York, County of Westchester, dismissed the second, third, and fourth causes of action—for unjust enrichment, punitive damages, and attorney's fees and costs, respectively—in the case of *Hudson National Golf Club Inc. v. David Anderson et al.* (Index no. 63195/2023, Doc. 45).

526.    In the decision and order in *Hudson National Golf Club Inc. v. David Anderson et al.* (Index no. 63195/2023), Justice Nancy Quinn Koba of the Supreme Court of the State of New

York, County of Westchester, held that "the second cause of action (unjust enrichment), the third cause of action (punitive damages), and the fourth cause of action (attorneys' fees and costs) are palpably insufficient and patently devoid of merit based on the Court's determination on the Motion."

527.    THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") provided lodging to David Anderson at 75 Finney Farm Road, Croton-On-Hudson, New York 10520 that contained several conditions which have been and are dangerous to the life, health and safety of David Anderson, his family, and guests, which conditions including, inter alia, the following: insect infestation, plexiglass windows, broken windows, damaged window seals, damaged door seals, broken sliding glass door, hole(s) in the front yard / driveway, heating failure(s), disrepaired condition(s), inaccessibility by vehicle due to failure to repair pothole(s) and placement of maintenance equipment frequently blocking the road, placement of a sawmill in the front driveway, and mold.

528.    The lodging which was provided to David Anderson contained pre-existing property damage.

529.    In *Hudson National Golf Club Inc. v. David Anderson et al.* (Index no. 63195/2023) THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") had no basis to allege that the lodging at 75 Finney Farm Road, Croton-On-Hudson, New York 10520 had a "fair market rental value of no less than Five Thousand ($5,000.00) per month."

530.    Having provided deficient lodging, which was in disrepair, the cause of action for "property damage" brought by THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") against David Anderson in *Hudson National Golf Club Inc v. David Anderson et al.* (Index no. 63195/2023) is meritless.

531.    In *Hudson National Golf Club Inc. v. David Anderson et al.* (Index no. 63195/2023), the Verified Complaint and Verified Amended Complaint refer to a purported contract that David Anderson was required to vacate a lodging at 75 Finney Farm Road, Croton-On-Hudson, New York 10520 by a "Vacate Date."

532.    David Anderson, THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY each understood and intended that the "Vacate Date" in a purported Agreement should have been changed from "March 31, 2023" in the typed form to "April 30, 2023."

533.    The scrivener's error in the paragraph describing the purported Vacate Date resulted from a pre-printed form, drafted by counsel for THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY and which was modified by hand, after a conference with the court, while David Anderson was pro se and THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY was represented by experienced counsel.

534.    Despite a mutual understanding that the "Vacate Date" should have been changed from "March 31, 2023" to "April 30, 2023," THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY brought meritless claims for breach of contract against, inter alia, David Anderson in *Hudson National Golf Club Inc. v. David Anderson et al.* (Index no. 63195/2023) for not vacating on or before March 31, 2023.

535.    On or before April 29, 2023, one or more agents of THE HUDSON NATIONAL GOLF CLUB, INC. (doing business as "Hudson National Golf Club" and THERON C. HARVEY took steps to remove David Anderson from the lodging at 75 Finney Farm Road, Croton-On-Hudson, New York 10520.

536. The timing of the filing of *Hudson National Golf Club Inc. v. David Anderson et al.* (Index no. 63195/2023) indicates a retaliatory intent.

## 9. <u>CAUSES OF ACTION</u>

### 9.1. <u>FIRST CAUSE OF ACTION – Fair Labor Standards Act – Unpaid Minimum Wages</u>

537. Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

538. Plaintiffs consented in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b).

539. At all times relevant, Plaintiffs and the members of the FLSA Collective were or have been employees within the meaning of 29 U.S.C. §§ 201 et seq.

540. At all times relevant, Defendants have been employers of Plaintiffs and the members of the FLSA Collective, engaged in commerce and /or the production of goods for commerce within the meaning of 29 U.S.C. §§ 201 et seq.

541. Defendants have failed to pay Plaintiffs and the members of the FLSA Collective the minimum wages to which they are entitled under the FLSA.

542. Defendants' unlawful conduct, as described in this Complaint, has been willful and intentional. Defendants were aware or should have been aware that the practices described in this Class Action Complaint were unlawful. Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiffs and the members of the FLSA Collective.

543. Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. §§ 201 et seq.

544.    As a result of Defendants' willful violations of the FLSA, Plaintiffs and the members of the FLSA Collective have suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. §§ 201 et seq.

**9.2.  SECOND CAUSE OF ACTION - Fair Labor Standards Act - Overtime Wages**

545.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

546.    Defendants have failed to pay Plaintiffs and the members of the FLSA Collective the premium overtime wages to which they are entitled under the FLSA for all hours worked beyond 40 per workweek.

547.    Defendants' unlawful conduct, as described in this Complaint, has been willful and intentional. Defendants were aware or should have been aware that the practices described in this Complaint were unlawful.

548.    Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiffs and the members of the FLSA Collective.

549.    Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. §§ 201 et seq.

550.    As a result of Defendants' willful violations of the FLSA, Plaintiffs and the members of the FLSA Collective have suffered damages by being denied overtime compensation in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. §§ 201 et seq.

**9.3.  THIRD CAUSE OF ACTION - New York Labor Law - Unpaid Minimum Wages**

551.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

552.    Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Complaint.

553.    At all times relevant, Plaintiffs and the members of the Rule 23 Class have been employees of Defendants, and Defendants have been employers of Plaintiffs and the members of the Rule 23 Class within the meaning of the NYLL §§ 650 et seq., and the supporting New York State Department of Labor Regulations.

554.    Defendants have failed to pay Plaintiffs and the members of the Rule 23 Class the minimum hourly wages to which they are entitled under the NYLL and the supporting New York State Department of Labor Regulations.

555.    Through their knowing or intentional failure to pay minimum hourly wages to Plaintiffs and the members of the Rule 23 Class, Defendants have willfully violated the NYLL, Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations.

556.    Due to Defendants' willful violations of the NYLL, Plaintiffs and the members of the Rule 23 Class are entitled to recover from Defendants their unpaid minimum wages, liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

**9.4.  FOURTH CAUSE OF ACTION - New York Labor Law - Unpaid Overtime**

557.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

558.    Defendants have failed to pay Plaintiffs and the members of the Rule 23 Class the premium overtime wages to which they are entitled under the NYLL and the supporting New York State Department of Labor Regulations for all hours worked beyond 40 per workweek.

559.    Through their knowing or intentional failure to pay Plaintiffs and the members of the Rule 23 Class overtime wages for hours worked in excess of 40 hours per workweek, Defendants have willfully violated the NYLL, Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations.

560.    Due to Defendants' willful violations of the NYLL, Plaintiffs and the members of the Rule 23 Class are entitled to recover from Defendants their unpaid overtime wages, liquidated damages as provided for by the NYLL, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

## 9.5.  **FIFTH CAUSE OF ACTION - New York Labor Law - Failure to Provide Wage Notices**

561.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

562.    Pursuant to Section 195(1) of the NYLL, an employer is required to provide its employees at the time of hiring a notice containing information, such as, "the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; ... the regular pay day designated by the employer ...; [and] the name of the employer .... For all employees who are not exempt from overtime compensation ..., the notice must sate the regular hourly rate and overtime rate of pay."

563.    Pursuant to Section 198-1(b) of the NYLL, an employee that does not receive a wage notification, as required by NYLL § 195(1), may bring a civil action to recover damages of $250 for each workday that the violation occurs or continues to occur, but not to exceed $5,000.

564.    At the time of hire, Defendants did not provide Plaintiff, David Anderson, or members of the putative class with wage notifications informing them of, among other things, (1) their regular rates of pay, (2) their overtime rates of pay, (3) the basis of their rates of pay (e.g., whether they were hourly employees), or (4) the regular pay day designated by Defendants.

565.    Defendants violated NYLL § 195(1) by failing to provide Plaintiffs and members of the putative class with wage notifications containing the information required by NYLL § 195, et seq.

566.    The failure of Defendants to provide Plaintiffs and members of the putative class with wage notifications in violation of NYLL § 195 was willful.

567.    By the foregoing reasons, Defendants are liable to Plaintiffs and members of the putative class the statutory amounts, plus attorney's fees, costs, and any other damages permitted under the NYLL.

## 9.6. <u>SIXTH CAUSE OF ACTION - New York Labor Law - Failure to Provide Accurate Wage Statements</u>

568.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

569.    Pursuant to Section 195(3) of the New York Labor Law, an employer is required to furnish each employee with a statement with every payment of wages that identifies, among other things, whether the employee is paid by the hour, shift, day, week, salary, piece, commission, or in another manner. For employees that are not exempt from overtime compensation under New York state law or regulation, such wage statement must also include "the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked."

570.    Pursuant to Section 198-1(d) of the New York Labor Law, an employee that does not receive a wage statement, as required by NYLL § 195(3), may bring a civil action to recover

damages of $50 for each workday that the violation occurs or continues to occur, but not to exceed $5,000.

571.    Named Plaintiffs and members of the putative class did not receive any wage statements from the Defendants.

572.    Defendants violated NYLL § 195(3) by failing to provide Named Plaintiffs and members of the putative class with wage statements containing the information required by NYLL § 195(3).

573.    The failure of Defendants to provide Named Plaintiffs and members of the putative class with wage statements in violation of NYLL § 195 was willful.

574.    By the foregoing reasons, Defendants are liable to Plaintiffs and members of the putative class and collective the statutory amounts, plus attorney's fees, costs, and any other damages permitted under the NYLL.

**9.7. <u>SEVENTH CAUSE OF ACTION - Unpaid Spread-of-Hours Pay</u>**

575.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

576.    12 NYCRR § 142-2.4 requires that "[a]n employee shall receive one hour's pay at the basic minimum hourly wage rate, in addition to the minimum wage required in this Part for any day in which... the spread of hours exceeds 10 hours [in a day]." ("Spread of hours" compensation).

577.    12 NYCRR 146-1.6 requires that "on each day on which the spread of hours exceeds 10, an employee shall receive one additional hour of pay at the basic minimum hourly rate."

578.    Plaintiffs and other members of the putative class regularly worked more than ten (10) hours in a day.

579.    Defendants did not pay Plaintiffs and other members of the putative class an additional hour's pay when they worked more than ten (10) hours in a day.

580.    Consequently, by failing to pay to Plaintiff, David Anderson, an additional hour's pay when Plaintiff, David Anderson, worked more than ten (10) hours in a day, Defendants violated 12 NYCRR § 142-2.4 and 12 NYCRR 146-1.6.

581.    By the foregoing reasons, Defendants have violated 12 NYCRR § 142-2.4 and 12 NYCRR 146-1.6 and are liable to Plaintiff, David Anderson, in an amount to be determined at trial, plus damages, interest, attorneys' fees and costs.

### 9.8. <u>EIGHTH CAUSE OF ACTION – New York Labor Law – Uniform Violations</u>

582.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

583.    Defendants have required Plaintiffs and the members of the Rule 23 Class to purchase and wear a uniform consisting of clothing that is not ordinary basic street clothing and that may not be worn as part of Plaintiffs and the members of the Rule 23 Class's ordinary wardrobe.

584.    Defendants failed to launder and/or maintain mandatory uniforms for Plaintiffs and the members of the Rule 23 Class and failed to pay Plaintiffs and the members of the Rule 23 Class the required weekly amount for uniform maintenance in addition to the required minimum wage.

585.    Through their knowing or intentional failure to pay and/or reimburse Plaintiffs and the members of the Rule 23 Class for mandatory uniform-related expenses, Defendants have willfully violated NYLL, Article 6, §§ 190 et seq., and the supporting New York State Department of Labor Regulations.

586.    Due to Defendants' willful violations of the NYLL, Plaintiffs and the members of the Rule 23 Class are entitled to recover from Defendants the costs of purchasing and maintaining their uniforms, liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

### 9.9. <u>NINTH CAUSE OF ACTION – New York Labor Law - Call-In Pay Violations</u>

587.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

588.    In violation of the New York Minimum Wage Act, N.Y. Lab. Law § 650 et seq., and minimum wage orders issued by the Commissioner for the New York Department of Labor, Defendants failed to pay "call-in pay" wages due under N.Y. Comp. Code Rules & Regs. tit. 12 §§ 142-2.3 and/or 146-1.5.

589.    Defendants are an employer subject to the New York Minimum Wage Act and minimum wage orders issued by the Commissioner for the New York Department of Labor.

590.    Plaintiffs are not exempt employees under the minimum wage orders issued by the Commissioner for the New York Department of Labor.

591.    Pursuant to N.Y. Comp. Code Rules & Regs. tit. 12 § 142-2.3, if a non-exempt employee reports for work on any day by request or permission of the employer, the employee shall be paid for at least four hours or the number of hours in the regularly scheduled shift, whichever is less, at the basic minimum wage. In the alternative, pursuant to N.Y. Comp. Code Rules & Regs. tit. 12 § 146-1.5(a), if a hospitality-industry employee reports for work on any day, the employee shall be paid for at least three hours for one shift or the number of hours in the regularly scheduled shift, whichever is less, at the applicable wage rate.

592.    Meetings constitute reports for work within the meaning of New York call-in pay requirements. Because meetings are not regularly scheduled, no set shift duration controls the minimum call-in pay. As a result, when caddies report for work by attending meetings, they are entitled to call-in pay.

593.    Plaintiffs and caddies reported for meetings pursuant to their employment with the Defendants, and on each occasion, they were not paid wages for the duration of the meeting and did not receive all call-in pay as required.

594.    Based on the foregoing, Plaintiffs, and members of the collective and class demand judgment against Defendants for damages in an amount to be determined at trial and all other appropriate relief.

### 9.10.    TENTH CAUSE OF ACTION – Untimely Paid Wages

595.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

596.    Defendants paid Plaintiffs and a sub-class and collective of similarly situated employees on a bi-weekly basis.

597.    Throughout the employment, Plaintiffs spent at least 25% of the working time performing physical tasks.

598.    Plaintiffs were "manual workers" within the meaning of NYLL § 191(1)(a).

599.    Defendants should have paid Plaintiffs on a weekly basis, "and not later than seven calendar days after the end of the week in which the wages were earned." N.Y. Lab. L. § 191(1)(a).

600.    Because Defendants failed to pay Plaintiffs on a weekly basis, in addition to other recovery available under the foregoing claims, Plaintiff Ross Johnson and similarly situated members of the collective and class are entitled to recover liquidated damages equal to wages that were paid a week late every bi-weekly period and are entitled to interest, attorney's fees and expenses.

### 9.11.    ELEVENTH CAUSE OF ACTION – Retaliation under the FLSA

601.    Plaintiffs repeat, reiterate, and incorporate all foregoing paragraphs as if fully set forth herein.

602. 29 U.S.C. § 215(a)(3) prohibits employers from discharging or in any other manner discriminating against an employee because such employee has filed any complaint relating to an employer's violation of the FLSA. See *Greathouse v. JHS Sec. Ins.*, 784 F.3d 105, 115 (2d Cir. 2015) (holding that § 215(a)(3) "does not restrict its protections to employees who file formal, written complaints with governmental agencies" and "encompass[es] oral complaints made to employers in a context that makes the assertion of rights plain.").

603. As described above, Defendants THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY are employers within the meaning of the FLSA, while Plaintiff David Anderson is an employee within the meaning of the FLSA.

604. As also described above, after Plaintiff David Anderson engaged in activity protected under the FLSA by filing this lawsuit, Defendants THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY retaliated by terminating his employment, filing a meritless lawsuit for breach of contract, and wrongfully evicting him and his family.

605. As a direct and proximate result of Defendants THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY's unlawful retaliatory conduct in violation of the FLSA, Plaintiff, David Anderson, has suffered, and continues to suffer, economic and noneconomic harm, for which Plaintiff David Anderson is entitled to an award of monetary damages and other relief.

606. Plaintiff, David Anderson, is also entitled to compensatory damages, punitive damages, liquidated damages, and attorneys' fees for Defendants' violations of the FLSA's anti-retaliation provisions.

**9.12.**      <u>**TWELVTH CAUSE OF ACTION – Retaliation under New York Labor Law**</u>

607.      Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

608.      NYLL § 215(1)(a) prohibits employers from discharging or in any other manner discriminating against an employee because such employee has made a complaint to his or her employer because the employer has engaged in conduct or the employee reasonably believes that the employer engaged in conduct that violates the NYLL, or because such employee has otherwise excised his or her rights under the NYLL.

609.      As described above, Defendants THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY are employers within the meaning of the NYLL, while Plaintiff, David Anderson, was an employee within the meaning of the NYLL.

610.      As also described above, after Plaintiff, David Anderson, engaged in activity protected under the NYLL, Defendants THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY retaliated by filing meritless claims against Plaintiff, David Anderson, and unlawfully evicting him and his family from their housing.

611.      At or before the filing of this Complaint, Plaintiff, David Anderson, has served notice of this action upon the Office of the New York State Attorney General pursuant to NYLL § 215(b)(2), thereby advising of the claim for retaliation under Section 215 of the NYLL.

612.      Plaintiff David Anderson served notice upon the attorney general pursuant to N.Y. Lab. Law § 215 at or before the commencement of this claim for retaliation.

613.      By the acts described herein and other acts, Defendants THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C.

HARVEY harassed, abused, and otherwise discriminated against Plaintiff David Anderson because of his participation in this lawsuit.

614.    As a result of Plaintiff David Anderson's unlawful retaliation, Plaintiff David Anderson sustained economic and non-economic damages in an amount to be determined at trial.

615.    As a direct and proximate result of Defendants THE HUDSON NATIONAL GOLF CLUB, INC., (d/b/a "Hudson National Golf Club") and THERON C. HARVEY's unlawful retaliatory conduct in violation of the NYLL, Plaintiff, David Anderson, has suffered, and continues to suffer, economic and non-economic harm, for which Plaintiff, David Anderson, is entitled to an award of monetary damages and other relief.

616.    Plaintiff, David Anderson, is also entitled to compensatory damages, punitive damages, liquidated damages, interest, and attorneys' fees for Defendants' violations of the NYLL's anti-retaliation provisions.

## 10. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs on behalf of themselves and all other similarly situated employees, respectfully requests that this Court grant the following relief:

    a.  Designate this action as a collective action on behalf of the FSLA Collective and authorize the prompt issuance of a notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the FLSA opt-in class, apprising them of the pendency of this action, and permitting them to assert timely FLSA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b);

    b.  Certify this case as a class action pursuant to Rule 23 for the class of employees described herein, certification of Plaintiffs as the class representatives, and designation of Plaintiffs' counsel as Class Counsel;

c.  Declare that Defendants violated the minimum wage provisions of the FLSA and NYLL;

d.  Declare that Defendants violated the overtime provisions of the FLSA and NYLL;

e.  Declare that Defendants violated the spread of hours provisions of the NYLL;

f.  Declare that Defendants violated timely pay provisions of the NYLL;

g.  Declare that Defendants violated call-in requirements of the NYLL;

h.  Declare Defendants violated the notice and recordkeeping provisions of the NYLL and WTPA;

i.  Declare that Defendants' violations of the FLSA and NYLL were willful;

j.  Award Plaintiff, the FLSA Collective, and the Rule 23 Class unpaid minimum wages under the FLSA and NYLL;

k.  Award Plaintiff, the FLSA Collective, and the Rule 23 Class unpaid overtime wages under the FLSA and NYLL;

l.  Award Plaintiff, the FLSA Collective, and the Rule 23 Class spread-of-hours wages under the NYLL;

m.  Award Plaintiffs, the FLSA Collective and the Rule 23 Class call-in pay under the NYLL;

n.  Award Plaintiffs damages for untimely payments under the NYLL;

o.  Award Plaintiffs, the FLSA Collective, and the Rule 23 Class liquidated damages under the FLSA;

p.  Award Plaintiffs, the FLSA Collective, and the Rule 23 Class liquidated damages under the NYLL;

q.  Award Plaintiffs, the FLSA Collective, and the Rule 23 Class damages for failure to lawfully issue wage notices under the NYLL;

r.  Award Plaintiffs, the FLSA Collective, and the Rule 23 Class damages for failure to lawfully issue wage statements under the NYLL;

s.  Award Plaintiffs, the FLSA Collective, and the Rule 23 Class award of prejudgment and post-judgment interest;

t.  Award economic damages in an amount to be determined at trial for Defendants' unlawful retaliation under 29 U.S.C. § 215;

u.  Award non-economic damages in an amount to be determined at trial for Defendants' unlawful retaliation under 29 U.S.C. § 215;

v.  Award economic damages in an amount to be determined at trial for Defendants' unlawful retaliation under NYLL § 215;

w.  Award non-economic damages in an amount to be determined at trial for Defendants' unlawful retaliation under NYLL § 215;

x.  Award of costs, expenses, and reasonable attorneys' and expert fees; and,

y.  Award such other and further relief as this Court deems just and proper.

## 11. <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated: November 22, 2024        Saco & Fillas, LLP
        Astoria, New York

By: _____*/s/ Clifford Tucker*_____
    Clifford Tucker, Esq.
    Geoffrey Kalender, Esq.
    31-19 Newtown Ave., 7th Floor.
    Astoria, New York 11102
    Ph: 718-269-2243
    CTucker@SaccoFillas.com

## NOTICE OF INTENTION TO ENFORCE SHAREHOLDER
## LIABILITY FOR SERVICES RENDERED

**TO**: THE HUDSON NATIONAL GOLF CLUB, INC.

PLEASE TAKE NOTICE THAT pursuant to the provisions of Section 630 of the Business Corporation Law of New York and Section 609 of the Limited Liability Company Law of New York, you are hereby notified that the Plaintiffs and others similarly situated intend to charge you and hold you personally liable, jointly and severally, as one of the ten largest shareholders and/or members of THE HUDSON NATIONAL GOLF CLUB, INC for all debts, wages, and/or salaries due and owing to them as laborers, servants, and/or employees of the said corporation/LLC for services performed by them for the said corporation/LLC within the six (6) years preceding the date of this notice and have expressly authorized the undersigned, as their attorney, to make this demand on their behalf

Dated: Astoria, New York
         May 30, 2023

SACCO & FILLAS, LLP

By: */s/ Clifford Tucker*
       Clifford Tucker, Esq.
       Attorneys for Plaintiff
       31-19 Newtown Avenue, Seventh Floor
       Astoria, New York 11102
       Tel: 718-269-2243
       CTucker@SaccoFillas.com

**DEMAND BY EMPLOYEES TO INSPECT SHARE RECORDS AND MINUTES PURSUANT TO SECTION 624 OF THE NEW YORK STATE BUSINESS CORPORATION LAW**

**TO**: THE HUDSON NATIONAL GOLF CLUB, INC.

PLEASE TAKE NOTICE THAT the Plaintiffs and others similarly situated as employees of the above corporation or LLC who intend to demand, pursuant to the provisions of Section 630 of the Business Corporation Law of New York, and Section 609 of the Limited Liability Company Law of New York, payment of debts, wages, and/or salaries due and owing to them as laborers, servants, and/or employees of the above corporation or LLC for services performed by them for the above corporation or LLC within the six (6) years preceding the date of this notice from the ten largest shareholders of the above corporation or LLC, and who have expressly authorized the undersigned, as their attorney, to make this demand on their behalf.

HEREBY DEMAND the right to examine, in person or by agent or attorney, during usual business hours, the minutes of the proceedings of the shareholders and records of shareholders of the above corporation/LLC and to make extracts therefrom on or after five (5) days from receipt of this notice.

Dated: Astoria, New York
          May 30, 2023

SACCO & FILLAS, LLP

By:  */s/ Clifford Tucker*
       Clifford Tucker, Esq.
       Attorneys for Plaintiff
       31-19 Newtown Avenue, Seventh Floor
       Astoria, New York 11102
       Tel: 718-269-2243
       CTucker@SaccoFillas.com